JOHNNY ORR V. THE STATE.

No. 15969. Delivered May 24, 1933.
Rehearing Denied June 21, 1933.
Reported in 61 S. W. (2d) 490.

The opinion states the case.

*William V. Brown,* of Texarkana, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

HAWKINS, JUDGE.—Conviction is for murder, punishment having been assessed at ten years in the penitentiary.

The general statement of the case is taken substantially from the brief of appellant's attorney. Prior to August 24, 1932, Bob Lamar resided alone in a four-room house. About August 24 Sam Harrison and Clarence (Slim) Echols (deceased), made arrangements with Lamar to occupy the house with him. On the night of August 24 Orr, (appellant), and Sam Hackett were visitors at Lamar's house. Shortly after their arrival, and while Orr was in Lamar's bedroom, a dispute arose between Hackett and deceased in the kitchen. Hearing the dispute, Orr and Lamar started into the kitchen; as they entered the door, they saw Hackett slap deceased in the face with his open hand. Orr intervened in behalf of deceased and told Hackett to let him alone. A short time later Hackett again struck deceased, and Orr for the second time took deceased's part, pulled Hackett away, and told deceased to go out in the yard, which he did, but returned immediately. He passed through the kitchen, and, as he was entering the sleeping porch, he made the remark, "It won't be long now." Orr, knowing what had just transpired between deceased and

Hackett, and hearing what deceased said, thought he was going to get a gun with which to kill Hackett, and Orr immediately followed deceased into the sleeping porch. Lamar and Hackett hurriedly left the house. Shortly after Orr followed deceased into the sleeping porch, a gun fired, and a moment later it fired again. Up to this point no conflict in the evidence is found.

It is undisputed that, after talking the matter over, Orr, Harrison, Lamar and Hackett agreed among themselves that they would report the death of deceased as a suicide and thereby prevent trouble for anybody. The sheriff was summoned by Lamar, and they all reported to him that it was a suicide. The following day all four of them appeared at the sheriff's office, and there each made an affidavit that deceased had committed suicide. It developed that one of the shots fired had struck an ice box on the sleeping porch. This was not discovered by the sheriff at the time he went to the scene of the killing. He accepted the statement of the survivors that the death of deceased was the result of suicide, and for that reason, perhaps, his investigation was not as thorough as it might otherwise have been. Rumors began to be circulated in the community that two shots had been fired, and the suicide story was questioned. Further investigation resulted in the arrest of Orr in October, 1932. Upon the trial, the state used Harrison as a witness, who, after reciting the undisputed facts substantially as heretofore detailed, testified as follows:

"* * * Well, when Slim went into that room Johnnie Orr followed him, went right in behind him. There was a little scuffle and then the gun fired; everything was still. I was standing in the partition door and I just walked in to see what had been done. When I got to the bedstead I saw Slim laying across the bed. I wasn't over four feet from Johnnie Orr when he shot him, he just drew the gun over and shot him and came out in the kitchen. Johnnie Orr shot Slim Echols. I saw Johnnie Orr when he shot Slim Echols. At the time Johnnie Orr shot him Slim was lying on his left side. He was not long-ways of the bed, he was across it. Johnnie Orr was standing right by the side of the bed when he shot him. He had the gun in his hand and threw it right around and shot him. He had the gun this way and threw it down this way and shot. The gun could almost have reached him from where he was. I mean standing where Johnnie Orr was the end of the barrel could have almost reached Slim. Could have reached his head, his body along here. Standing where he was I believe he could have touched him from his chest down to his feet with that

gun. He was standing right by the bed. He shot two times, one shot went in the ice box and the other went into his head. I do not know what position they were in when the shot went into the ice box. I certainly do know what position they both were in when he shot the second time. Slim was laying across the bed. Slim Echols was not that I know of at that time making any kind of attack on Johnnie Orr. At that time he was just lying there, wasn't moving. I didn't examine Slim Echols any more then, I reached down and struck a match and saw that the side of his head was shot off and I said, 'Johnnie you have killed him.' He was dead, his whole head was shot off nearly. Immediately after the shooting Johnnie Orr came into the kitchen and said, 'This has got to be suicide.' "

The witness testified that the shot which went into the ice box was the first one fired. He admitted that he had trimmed the hole out in the ice box and plugged it up, and that he reported the killing to the sheriff as a suicide and later made affidavit to that effect.

Appellant testified in his own behalf and also used as witnesses Lamar and Hackett. The testimony of Lamar and Hackett is substantially in accord with Harrison and appellant as to the events leading up to the killing, and is to the further effect that after Orr followed deceased on to the porch Lamar pushed Hackett out of the house; that soon afterwards they heard two shots, but did not know what had happened because they were not in the house. These two witnesses claim to have heard scuffling on the sleeping porch before the shots were fired. The witnesses admit that Orr, immediately after the killing, said something about a suicide.

The ice box seems to have disappeared from the scene of the killing. Lamar admitted that they found where the first shot had gone into the ice box; said he did not know who got it, but he had given it to Paul Hackett; that some one moved the box off the sleeping porch, but denied that he moved it. In his subsequent investigation the sheriff found the ice box and discovered some buck shot still in the wood where the hole had been plugged. Orr's version of the matter, on direct examination, was as follows: He intervened in behalf of deceased when Hackett slapped him and told deceased to go out in the yard; when he immediately came back and passed through into the sleeping porch he thought he was getting a gun; he (Orr) went in there to prevent deceased from shooting Hackett; as he entered the sleeping porch, he saw deceased with the gun and

grabbed it; he and deceased were scuffling over it when the gun fired the first time; the first shot went into the ice box; they continued to scuffle for possession of the gun and fell on the bed, and the gun was discharged the second time, the load stiriking and killing deceased; that Orr never intended to shoot deceased and was trying to keep down trouble between deceased and Hackett. He claimed that in response to a comment from Harrison that "Ain't that awful?" he (Orr) said, "It sure is, it is pretty near suicide, ain't it?" He said they all agreed to and did make an affidavit claiming it was a suicide because they did not want Hackett to get arrested about the fight and all of them thought because it was an accident it would be best for them to say it was suicide and none of them would have to go to jail. On cross-examination he testified:

"When I first saw him with the gun he was about the middle of the bed. At that time he had the gun up to his shoulder in shooting position and pointing it toward the open door. I was inside the room where Slim was. I was not exactly between him and the door, but kind of over from between him and the door a little. Inside the other room was Sam Hackett, Bob Lamar and old man Harrison. When that gun went off I was standing right there. Slim never had moved out of his tracks when the gun went off the first time. While we were scuffling it went off the second time, that is when we both fell across the bed. When we both fell across the bed the gun went off the second time and that is what killed Slim Echols, shot him in the neck and came out right along here. * * * Yes, I took one shell out of that gun. You ask me why I did that. I couldn't find where it went in the house that night. No, I did not before the officers got there that night deliberately frame that so there would not be but one shot fired. All of us talked it over. No, I was not the first one that said it would be suicide, I couldn't say who it was, we were all talking. No, I can not name anyone that said that would have to be suicide besides me. You ask me so far as I know what old man Harrison saying that I was the only one that said, 'this has got to be suicide,' so far as I know that is true you say—I know old man Harrison swore it. You say so far as I know it is true. Yes, but I don't remember who said it. Yes, after I said it had to be suicide and after that shot had been fired and before the officers had gotten there I took one of the shells out of the gun to make it appear that only one shot was fired. Immediately after the officers came I gave my statement that it was suicide."

The gun belonged to appellant, but had been borrowed from him by Lamar some three weeks before the killing, and had been kept during this time at Lamar's house.

The reputation of none of the survivors seems to have been above reproach. Harrison had been convicted in the federal court for selling whisky. Orr had been convicted in another state for the theft of cattle and served a term in the penitentiary. Lamar had served a term in the penitentiary, and was under indictment in the State of Arkansas on a charge of burglary. Hackett had been convicted of a felony on a liquor charge, and had been to the penitentiary but was released on parole.

When the state rested, appellant's attorney requested the court to direct a verdict of acquittal on the ground that Harrison was an accomplice witness, and his testimony had not been corroborated as required by article 718, C. C. P. This request was denied, and appellant placed his witnesses on the stand, and, after all the testimony was in, renewed the motion for an instructed verdict, which was overruled.

Article 77, P. C., defines an "accessory" as one who, "knowing that an offense has been committed, conceals the offender, or gives him any other aid in order that he may evade an arrest or trial or the execution of his sentence." It has been held that under the foregoing definition it is not essential that the aid rendered to the criminal shall be of a character to enable the criminal to effect his personal escape or concealment, but it is sufficient if it enables him to elude present arrest and prosecution. Blakeley v. State, 24 Texas App., 616; Gatlin v. State, 40 Texas Crim. Rep., 116; Conant v. State, 51 Texas Crim. Rep., 610; Littles v. State, 111 Texas Crim. Rep., 500, 14 S. W. (2d) 853; Largent v. State, 116 Texas Crim. Rep., 286, 32 S. W. (2d) 652; Turner v. State, 117 Texas Crim. Rep., 434, 37 S. W. (2d) 747. The same authorities support the proposition that, if one's conduct is such as to characterize him as an accessory, he is an accomplice witness as a matter of law. In the opinion on rehearing in Little's case (supra) we said: "Nor have we any doubt of the correctness of our holding, that one who affirmatively aids in any way another who has committed a crime, to evade arrest or escape prosecution or punishment, is an accessory to such crime; and if in the course of human events he turns against the person so aided and give testimony against him in a criminal judicial proceedings, his testimony should be characterized as that of an accomplice."

If it be admitted that appellant committed a crime when

Echols was killed, then, if Harrison, Hackett, and Lamar knew that a crime had been committed, their agreement, which was carried out, to report the affair to the authorities as a suicide, undoubtedly aided appellant to escape present arrest and prosecution, and did in fact delay his arrest for some two or three months, which conduct under the law would make them accessories, and taint their testimony as accomplice witnesses. It would extend this opinion unnecessarily to recite all the facts developed from Hackett and Lamar on cross-examination, but it appears therefrom that both of them knew about one shot having struck the ice box, and this fact was by them concealed from the authorities. Looking to the case in its entirety, it appears that these two witnesses must be regarded as accomplice witnesses, and as such they could not furnish the necessary corroboration for Harrison's testimony. It is believed, however, that sufficient corroborative evidence may be found in appellant's own testimony to meet the requirements of the law and support the jury's finding. The corroborative testimony need not be sufficient to establish the guilt of accused independent of the testimony of the accomplice witness, for, if this were the rule, the testimony of the accomplice witness would be of no value. Branch's Ann. Tex. P. C., sec. 719. Neither is it required that the corroboration be conclusive. It is sufficient if it tends to connect accused with the commission of the offense. (Branch's Ann. Tex. P. C., sec. 719.) In Minor v. State, 108 Texas Crim. Rep., 1, 299 S. W., 422, it was said: "The state is not called upon to point to some single or isolated fact which in itself, unrelated to other proven facts, will be sufficient corroboration. It is the combined and cumulative weight of the evidence furnished by non-accomplice witnesses which supply the test. If by this rule it appears on appeal that before the jury there was proof confirming the testimony of the accomplice to material facts tending to connect the accused with the commission of the offense, the law is satisfied. Underhill's Crim. Ev. (3rd Ed), Secs. 129 and 130; Meredith v. State, 85 Texas Crim. Rep., 239, 211 S. W., 227; Wright v. State, 47 Texas Crim. Rep., 433, 84 S. W., 593; Huggins v. State, 85 Texas Crim. Rep., 205, 210 S. W., 804; Halbadier v. State, 85 Texas Crim. Rep., 593, 214 S. W., 349; Middleton v. State, 86 Texas Crim. Rep., 307, 217 S. W., 1046; Walker v. State, 94 Texas Crim. Rep., 653, 252 S. W., 543; Willman v. State, 99 Texas Crim. Rep., 259, 268 S. W., 933, 269 S. W., 801."

In the later case of McInnis v. State, 54 S. W. (2d) 96, it was held that, in connection with what had been said in Minor's

Case, "* * * the combined and cumulative testimony of the non-accomplice witnesses would not be as to material facts, unless the facts established by this combined and cumulative testimony were of a criminative character, that is, such as tended to connect accused with the commission of the offense charged."

If the jury be given credit of following the court's instruction, they believed Harrison's testimony was true, otherwise they would not have been authorized to convict. They knew that the report of deceased's death as a suicide was false; all parties were agreed on that. They were not bound to accept as true appellant's story told on the witness stand that deceased was accidentally killed, and evidently did not do so, for, if they had, the court had told them to acquit. Believing that Harrison had told the truth about it on the trial, and that appellant had not, the jury had before them from appellant's own testimony the following incidents which they could appropriate as criminative material circumstances tending to support Harrison's testimony, and tending to connect appellant with the commission of the crime charged against him. Appellant was alone in the room with deceased when he was killed; he had hold of the gun when it was discharged; he, together with the others, immediately agreed to report it as a suicide, which was false, and according to Harrison appellant was the originator of the idea; he carried out the agreement and knew that the others did also; in order to make it appear a suicide, he removed one exploded shell from the gun to mislead the authorities if an investigation resulted. On his direct examination before the jury he said he and deceased were scuffling over the gun when both shots were fired; on cross-examination he changed his testimony and said he had not yet gotten to deceased at the time the first shot was fired. Assuming that Harrison did testify truthfully before the court (and the jury found that he did), we find no escape from the conclusion that from appellant's own testimony there was before the jury material criminative circumstances sufficiently tending to connect him with the offense charged.

So believing, an affirmance of the judgment should follow, and it is so ordered.

*Affirmed.*

### ON MOTION FOR REHEARING.

LATTIMORE, JUDGE.—Appellant earnestly insists that it was error for which reversal should be ordered, for the trial court to fail and refuse to grant his motion for an instructed verdict when the state rested its case. We did not discuss this

point in our original opinion. The record reveals that, when the state rested, appellant made a motion for a peremptory instruction to acquit on the ground that the evidence was insufficient; and that the accomplice was in nowise corroborated, which motion was overruled. Appellant cites no authorities supporting his contention.

We can not agree with appellant. If he felt that the state had made no case, he had a perfect right to decline to introduce testimony, and to bring the proposition before this court for review upon appeal, but he did not see fit to do so.

The rights of the accused are fully set forth in the Constitution and laws of this state. He can not compel the trial of a case by piecemeal. When the state rests its case and the accused does the same, then and then alone can the court be compelled to formulate and submit his charge to the jury. If then he refuses a peremptory instruction in a case whose facts are not sufficient, for lack of corroboration of an accomplice, or for any other reason, proper complaint by exception or otherwise would call for reversal by this court. If, believing that when the state rests its case same is not made out,—for any reason whatever appellant, notwithstanding procedes to introduce testimony which fills out the gaps, or supplies the missing links, and measures up to the demands of the law, the accused has no right of complaint. The exact point was decided in Johnson v. State, 104 Texas Crim. Rep., 312, 283 S. W., 809.

We have reviewed the case on its facts, the point being made that we erred in holding the corroboration sufficient, and are of opinion that our former conclusion affirming the case must be sustained. The motion for rehearing is overruled.

*Overruled.*