R. C. TIPTON v. THE STATE.

No. 16757. Delivered June 6, 1934.

The opinion states the case.

*Fred O. Jaye,* of De Leon and *Oscar Callaway* of Comanche, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin for the State.

CHRISTIAN, JUDGE.—The offense is murder; the punishment, confinement in the penitentiary for life.

It was charged in the indictment, in substance, that appellant, with malice aforethought, killed P. H. (Pink) Milton by shooting him with a gun.

State's witness Gragor Wiesendanger testified, in substance, as follows: He and Ab. White went to deceased's home in the town of Comanche on the night of January 20, 1933, for the purpose of buying some whisky. Deceased came out to their automobile and handed the witness a half-gallon of whisky. White handed deceased a ten dollar bill. As deceased was preparing to change the bill, a man jumped out from behind the car, presented a pistol and ordered the parties to put their hands up. Immediately thereafter this man fired two shots and deceased fell. Holding the gun on the witness and White, their assailant bent over deceased for a moment, and, then ordering the parties to keep their hands up, ran away from the scene of the killing.

State's witness Clay Frost lived 360 feet north of the home of deceased. At the time deceased was killed the witness was standing in his yard. According to his version, three minutes after hearing a gun shot a man passed within 15 feet of the witness running at a rapid gait. There was a light on the street. This man was just coming out of the light when the witness saw him. He was coming from the direction of deceased's home. At this juncture, we quote from the testimony of the witness as follows:

"Well, this party that I saw running there, was a man weighing, I judge, about one hundred and fifty pounds—he didn't stop for me to weigh him—just about a hundred and fifty pounds, I think, and he was just a little bit stooped. The best I could tell he had on dark clothes. I judge he was about my height, something like that, about five and eight and a half, something like that, approximately. In my best judgment this defendant—he has the appearance of the party there that I saw on that occasion. In my best judgment the party I saw looked like that man (the defendant), just his general appearance as he went over the fence. * * * I say that that defendant there resembles the character of man that come through my yard. I

did not say he was humpbacked. I said that he stooped a little bit. He was a man that looked a whole lot like that man there (the defendant). It looks a lot like him, the appearance of the man. When I came back up here I saw this boy today. That is the first time I have seen him, unless I saw him the first time as I think in the yard, but this would be the second time (in that case). The first time I have seen him since I came back here is today. Well, I think this is the man I saw there. I can't swear that it was him. It looked like him. That is the only time I ever saw him, if I saw him then, and today, today and the night of the murder. Of course, there was a little light that night I saw the man running, a street light. It has been about ten months ago, I suppose. You could count it up."

An examination of the body of deceased disclosed a ten dollar bill near his left side. It appears that he had nothing else on his person except a pocket knife and a few pennies. A bullet had entered the edge of his breast bone and gone through the body and out of the back about the shoulder blade. There were powder burns on the face and hands. According to the testimony of a sister of deceased, he was accustomed to carry his money in his shirt pocket on the left side. Shortly prior to the homicide she had given deceased $215.00 that she had been keeping for him. She did not know whether he was carrying the money at the time he was killed. There was testimony to the effect that deceased had a shotgun in his automobile prior to the homicide and that after the homicide the window of the automobile was discovered to be broken and the shotgun gone. A shotgun was found nearby in a ditch. The automobile was in an open garage at deceased's home. There were tracks leading from the point where deceased was killed to the front of Clay Frost's house. Appellant was in the town of Comanche on the day deceased was killed.

State's witness Mrs. Lennie Cropper testified that she lived in the town of Hamilton on the 20th of January, 1933; that on that date appellant was at her house; that appellant left with one Monte Sims sometime in the afternoon on the date mentioned; that about midnight of January 20th she again saw appellant, his wife and Monte Sims at her house. At this juncture, we quote from the testimony of the witness as follows:

"Well, when R. C. Tipton (appellant) come in and sat down he said he had killed a fellow at Comanche. He said he had killed a fellow at Comanche. And I said, 'Oh, no, you haven't,' and he said, 'Yes, I had to.' Will I have to go ahead and tell the rest? Q. Well, let's see, didn't he tell you about getting the gun

out of the car?  A.  He hid it behind a bush.  He said something about the glass of the car, that he taken his hands and wiped the finger prints off.  He said he broke the glass to get in the car to get the gun.  Then he said he walked up to the front of the house and told them to stick up their hands, told that man to stick his hands up, and he went up with one hand, and was trying to draw his gun with the other one, and he told him, he said, 'Don't do that, don't do it,' and that the other fellow didn't pay any attention to him but shot at him, and he said he had to kill him or get killed.  Well, then, when he shot him he knocked the gun out of his hand over in the ditch and he went over and picked it up, and come back and then got his money, got the money off of the fellow, and then run across the yard, and some old fellow he thought was going to shoot him, and he got behind some bushes, thought this other old fellow was going to shoot him, and saw that he wasn't going to shoot him, and he went on to the car.

"Well, he said, that they rode around and got lost, and finally come back through here and come on back to my house.  He said while lost or on the way to Hamilton that he threw that man's gun away, and that she threw his cap away.  There was also something said about some shoes, that he hid the shoes under some bridge.  That is what he said.

"As to what was said at my place about any money that was taken off of this fellow that he shot,—well, she (appellant's wife) taken the money out of her bosom and gave it to him, at my house.  She gave Tipton in my presence two hundred and thirty three dollars.  When she (Mrs. Tipton) gave it to him, she said, 'This is just like you gave it to me.' "

Appellant did not testify, and introduced no witnesses.

We are unable to reach the conclusion that the evidence is insufficient.

Upon cross-examination, State's witness Mrs. Lennie Cropper testified as follows:  "I went before the grand jury up here in the spring term of the court after this matter happened.  I was up here twice.  As to whether I was up here for the first time in April, I don't know what day it was.  I was up here twice.  Q.  You didn't tell the grand jury any of this did you?  A.  Yeah.  Q.  Do you mean to say you told the grand jury at that time that this man here—?  A.  Not the first time.  I told them the next time. * * * It was Saturday evening after this killing took place that the officers first came to my house and questioned me about it.  Yes, it was the next day.  I didn't tell the officers at that time that this man right here killed him.  I told

them at that time that I didn't know anything about it." On redirect-examination the witness testified: "I did not tell about this until this defendant here was arrested and at that time I told it. That is correct. I didn't tell it because I was afraid of that woman." Appellant excepted to the charge of the court for its failure to instruct the jury that the witness was an accomplice as a matter of law. In support of his contention, that the witness was an occomplice as a matter of law, appellant cites Littles v. State, 14 S. W. (2d) 853, and other decisions by this court. In each of the cases cited by appellant it was shown that the witness affirmatively aided the one who had committed the offense to evade arrest or escape prosecution or punishment. For example, in Littles' Case, the witness upon first being questioned concerning the homicide made false declarations to the officers favorable to the accused. In short, his version was in the nature of an affirmative statement which, if testified to upon the trial of the accused, would have raised an affirmative defense. Such being the case, this court held that when the witness took the stand for the State he became an accomplice witness. In the case of Orr v. State, 61 S. W. (2d) 490, the witnesses, knowing that the crime had been committed, agreed to report the affair as a suicide, and pursuant to their agreement, they made affidavits that the deceased had committed suicide. In Turner v. State, 37 S. W. (2d) 747, immediately after the killing the witness had stated to the officers that the shot was fired in a scuffle from the gun of deceased, and not by the appellant. In other words, as described by the witness, the killing was accidental. Upon testifying for the State, the witness admitted that the version she had given to the officers had been false. Under the circumstances, it was held that the witness was an accomplice.

In the present case, we are unable to reach the conclusion that the testimony shows that the witness, being sworn before the grand jury, declared that she knew nothing about the homicide. Her statement concerning the matter was to the effect that she was before the grand jury and said nothing about it. Whether she was sworn and questioned concerning the matter cannot be determined from the record before us. Hence we do not decide whether one who testifies before the grand jury that he knows nothing about an offense, and thereafter admits the falsity of such statement, should be classified as an accomplice witness, when testifying for the State. The record before us reveals no more than that upon being questioned by the officers concerning the death of deceased. The witness stated to them

that she knew nothing about the matter, notwithstanding appellant had previously stated to her that he had killed a man in Comanche. This statement was not an affirmative statement of facts tending to raise any defense for appellant, or a statement within itself indicating an effort to shield or protect appellant. We think the rule is correctly stated by Mr. Branch in his Annotated Penal Code, sec. 702, as follows:

"The fact that the witness falsely denied having any knowledge of the crime will not of itself render such witness an accomplice. Martin v. State, 44 Texas Crim. Rep., 283, 70 S. W., 973. Alexander v. State, 49 Texas Crim. Rep., 95, 90 S. W., 1112. Pinckard v. State, 62 Texas Crim. Rep., 602, 138 S. W., 601. Hargrove v. State, 63 Texas Crim. Rep., 143, 140 S. W., 234."

The present case, in our opinion, is distinguishable from the cases relied upon by appellant, in that here there was no affirmative act on the part of the witness in aid in any way of appellant to evade arrest or escape prosecution or punishment. She gave no affirmative false testimony which would have in any manner exculpated appellant if she had testified in his behalf upon the trial. She had entered into no conspiracy with anybody to give false testimony in an effort to aid appellant. Thus, clearly she was within the rule quoted from Branch, supra. It follows that the opinion is expressed that the court was not in error in declining to instruct the jury that the witness was an accomplice.

The judgment is affirmed.

*Affirmed.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.