[No. 84714-2.   En Banc.]
Argued June 14, 2011.     Decided February 16, 2012.

THE STATE OF WASHINGTON, *Respondent*, v. KENNETH RICHARD BUDIK, *Petitioner*.

*Janet G. Gemberling* (of *Janet Gemberling PS*), for petitioner.

*Steven J. Tucker, Prosecuting Attorney*, and *Mark E. Lindsey* and *Andrew J. Metts III, Deputies*, for respondent.

¶1 Owens, J. — Kenneth Budik was one of two victims of a shooting in the city of Spokane. The other victim, Adama Walton, died as a result of the shooting. Based on Budik's statements that he did not know who was responsible for the crime, he was charged with, and convicted of, first degree rendering criminal assistance. Insufficient evidence supports Budik's conviction; accordingly, we reverse the Court of Appeals and vacate Budik's conviction.

## █ FACTS[1]

¶2 In the early morning hours of September 14, 2007, 20 year old Budik accompanied 28 year old Walton to the Big

---

[1] Because this is a challenge to the sufficiency of the State's evidence, we assume the truth of the State's evidence, even where Budik provided conflicting testimony. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

Easy nightclub in downtown Spokane. As club authorities had, at some earlier point, become aware that Budik's identification was fake, Budik waited in Walton's 2007 Chevrolet Avalanche pickup truck with a box of wine. Walton returned an hour later, around 2:00 a.m., and the two departed for an "after party." 2 Verbatim Report of Proceedings (VRP) at 199.

¶3 Arriving at the party, which was at a private residence, Budik got out and briefly mingled with several persons he knew in the front yard. Walton, meanwhile, remained in the truck and spoke to a number of individuals. After approximately 10 minutes, Walton gestured for Budik and Budik returned to the truck. Walton then drove to the next intersection, made a U-turn, and came to an abrupt stop in front of the party, squealing his tires. As Budik was sitting in the passenger seat, several gunshots rang out. One shot struck Budik through his left pectoral muscle, shattering a bone in his shoulder. Another bullet went through Budik's left leg, just above the kneecap. Walton was even less fortunate, sustaining one gunshot wound to the abdomen and another that passed through both of his lungs and his heart. Walton stepped on the accelerator and the truck traveled a block and a half before colliding with two parked cars and overturning. Budik managed to pull himself from the truck, sought help from a nearby resident, and then called 911.

¶4 The first law enforcement officer to interact with Budik was Officer Kevin King. As he was responding to reports of a shooting, the officer had his gun drawn as he approached Budik. Officer King asked Budik a number of questions, one of which was who was responsible for the shooting. Budik replied that he did not know. A second officer, Officer Eugene Baldwin, eventually joined Budik and Officer King. At Officer King's direction, Officer Baldwin patted Budik down for weapons and, finding none, then asked Budik several additional questions. When questioned about who was responsible for the shooting, Budik

consistently answered that he did not know. Shortly after Budik was taken to the hospital, Officer Baldwin met Detective Ferguson at the hospital and resumed questioning Budik in the trauma room while doctors and nurses worked on him. Budik declined to give them any specific information.

¶5 The day after the shooting, Detective Kip Hollenbeck, with Detective Ferguson, paid a visit to Budik's hospital room. Based on a bullet casing found in the passenger side of the truck, Detective Hollenbeck believed that the shooters must have been so close to the vehicle that Budik would necessarily have seen them. Budik immediately said that he did not see anything. Detective Hollenbeck continued to press Budik for details, and Budik explained what had occurred leading up to and following the shooting. During this exchange, Budik told Detective Hollenbeck that he had been leaning over to pick up a beer when the first shot rang out, though, based on the wounds Budik sustained, the detective did not believe him. When Detective Hollenbeck persisted in asking Budik to identify the assailants, Budik shook his head and asked the detectives to leave. Detective Hollenbeck was left with the belief that Budik feared retaliation.

¶6 Several days after the shooting, Walton's mother, Rae Ann Walton (Rae), went to Budik's home and left a note in the mailbox asking Budik to call her. Budik did so one or two days later. Rae asked Budik, "[W]ho killed my son?," and he replied, "Rascal [Juwuan Nave] did it." 1 VRP at 121. Budik went on to indicate that Nave had walked from behind Freddie Miller and that the shooting then began.

¶7 During their investigation, the police quickly became aware of three primary suspects: Titus Davis, Nave, and Miller. Police believed that these three individuals were gang members. Miller was detained and interviewed the day of the shooting and was later charged with murder. Police identified Davis as a suspect by September 15, 2007, and had heard of Nave's involvement "[e]arly on." 2 VRP at 183.

¶8 Detective Hollenbeck described the investigation as "one of the most difficult cases" that he had ever worked on, owing to the fear witnesses had of cooperating with the police. 1 VRP at 146. Ultimately, both Davis and Miller were charged with murder. Nave, however, was never charged because although police could place him at the scene, they could not connect him to the fatal shooting of Walton. Detective Hollenbeck testified that it would have been "helpful" had he known that someone had seen Nave participate in the shooting and that the investigation would "have been able to take a different turn" if Budik had told him that Nave was the shooter. 1 VRP at 144; 2 VRP at 184. However, Detective Hollenbeck also testified that he did not credit the account Budik related to Rae; Detective Hollenbeck believed this was simply a rumor circulated to make Nave the "fall guy" for the shooting. 2 VRP at 183.

¶9 Based on Budik's repeated disavowals of knowledge of the shooters' identities, the State charged Budik with first degree rendering criminal assistance. The jury found Budik guilty, and the judge sentenced Budik to 13 months in prison, the low end of the standard range. Budik appealed his conviction, raising an as-applied challenge to the constitutionality of his conviction, challenging the sufficiency of the State's evidence, and asserting ineffective assistance of trial counsel. The Court of Appeals denied all three challenges and affirmed Budik's conviction. *State v. Budik*, 156 Wn. App. 123, 130, 132, 230 P.3d 1094 (2010). Budik petitioned this court for review of the sufficiency challenge, and we granted review. *State v. Budik*, 170 Wn.2d 1008, 249 P.3d 624 (2010).

ISSUE

¶10 Does sufficient evidence support Budik's conviction?

## ANALYSIS

### I. Standard of Review

¶11 In a challenge to the sufficiency of the evidence supporting a criminal conviction, the question is whether, viewing the evidence in the light most favorable to the State, "any rational fact finder could have found the essential elements of the crime beyond a reasonable doubt." *State v. Engel*, 166 Wn.2d 572, 576, 210 P.3d 1007 (2009). To determine whether the State has produced sufficient evidence to prove each element of the offense, we must begin by interpreting the underlying criminal statute. Statutory interpretation is a question of law, which we review de novo. *Id.*

¶12 When interpreting a statute, our objective is to determine and give effect to the legislature's intent. *State v. Ervin*, 169 Wn.2d 815, 820, 239 P.3d 354 (2010). We first attempt to ascertain the plain meaning of the statute. *Id.* "In determining the plain meaning of a provision, we look to the text of the statutory provision in question, as well as 'the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole.' " *Id.* (quoting *State v. Jacobs*, 154 Wn.2d 596, 600, 115 P.3d 281 (2005)). If the statute remains susceptible to more than one reasonable interpretation, it is ambiguous, and we "look to the legislative history of the statute and the circumstances surrounding its enactment to determine legislative intent." *Rest. Dev., Inc. v. Cananwill, Inc.*, 150 Wn.2d 674, 682, 80 P.3d 598 (2003).

¶13 With these standards in mind, we turn to Budik's conviction of first degree rendering criminal assistance.

### II. Rendering Criminal Assistance Requires an Affirmative Act or Statement

¶14 Budik was convicted of rendering criminal assistance in the first degree, a class C felony, under former

RCW 9A.76.070 (2003).[2] A person violates this statute if (1) "he or she renders criminal assistance" (2) to another person "who has committed or is being sought for murder in the first degree or any class A felony or equivalent juvenile offense." *Id.* The term "renders criminal assistance" is defined by RCW 9A.76.050. That statute provides that

> a person "renders criminal assistance" if, with intent to prevent, hinder, or delay the apprehension or prosecution of another person who he knows has committed a crime or juvenile offense or is being sought by law enforcement officials for the commission of a crime or juvenile offense or has escaped from a detention facility, he:
>
> (1) Harbors or conceals such person; or
>
> (2) Warns such person of impending discovery or apprehension; or
>
> (3) Provides such person with money, transportation, disguise, or other means of avoiding discovery or apprehension; or
>
> (4) Prevents or obstructs, by use of force, deception, or threat, anyone from performing an act that might aid in the discovery or apprehension of such person; or
>
> (5) Conceals, alters, or destroys any physical evidence that might aid in the discovery or apprehension of such person; or
>
> (6) Provides such person with a weapon.

RCW 9A.76.050. In other words, a person renders criminal assistance if he or she (1) knows that another person (a) "has committed a crime or juvenile offense" or (b) "is being sought by law enforcement officials for the commission of a crime or juvenile offense" or (c) "has escaped from a detention facility" and (2) intends "to prevent, hinder, or delay the apprehension or prosecution" of that other person and (3) undertakes one of the six specified actions. *Id.* In this case we are solely concerned with the fourth action—"[p]revent[ing] or obstruct[ing], by use of force, deception, or threat, anyone from performing an act that might aid in the

---

[2] In 2010, the legislature elevated this crime to a class B felony. Laws of 2010, ch. 255, § 1.

discovery or apprehension" of a person sought by law enforcement officials. RCW 9A.76.050(4); *see* Clerk's Papers at 26 (jury instruction relying solely on this action).

¶15 In interpreting this portion of the statute, we look to the statutory scheme as a whole. Two similar crimes exist under chapter 9A.76 RCW. RCW 9A.76.020 makes the willful hindrance, delay, or obstruction of a "law enforcement officer in the discharge of his or her official powers or duties" a gross misdemeanor. Conviction under this statute requires "some conduct in addition to making false statements." *State v. Williams*, 171 Wn.2d 474, 486, 251 P.3d 877 (2011). RCW 9A.76.175 makes it a gross misdemeanor to make a false or misleading statement to a public servant if that statement is "reasonably likely to be relied upon by [the] public servant in the discharge of his or her official powers or duties."

¶16 This statutory scheme evidences legislative intent to require an affirmative act or statement in order to constitute "deception" within the context of RCW 9A.76.050(4). First, the legislature expressly criminalized making false or misleading material statements to the police in RCW 9A.76.175. In doing so, it expressed the manner in which it intended to deal with such statements and provided that they are punishable as gross misdemeanors. Rendering criminal assistance, on the other hand, can be up to a class B felony. Second, under the canon of noscitur a sociis, we construe a term in light of those terms with which it is associated. *State v. Roggenkamp*, 153 Wn.2d 614, 623, 106 P.3d 196 (2005). The five other means of rendering criminal assistance require some affirmative act or statement, be it harboring or concealing the person sought, RCW 9A.76-.050(1); warning the person sought of impending discovery, RCW 9A.76.050(2); providing a sought person money, a disguise, transportation, or other means of evading discovery, RCW 9A.76.050(3); concealing, altering, or destroying physical evidence that would aid in discovery, RCW 9A-.76.050(5); or providing the person sought with a weapon,

RCW 9A.76.050(6). From this, we infer that the legislature similarly intended to require an affirmative act or statement in order to violate RCW 9A.76.050(4).

¶17 The history of RCW 9A.76.050 reinforces our conclusion that it requires an affirmative act or statement and sheds light on the nature of the affirmative act or statement required. RCW 9A.76.050 was enacted as part of the adoption of the current criminal code in 1975. Laws of 1975, 1st Ex. Sess., ch. 260, § 9A.76.050. The crime of rendering criminal assistance replaced the then-existing concept of serving as an accessory after the fact. 13A Seth A. Fine & Douglas J. Ende, Washington Practice: Criminal Law § 1801, at 366 (2d ed. 1998); Laws of 1975, 1st Ex. Sess., ch. 260, § 9A.92.010(4) (repealing RCW 9.01.040, which defined "accessory," former RCW 9.01.040 (Laws of 1909, ch. 249, § 9). RCW 9A.76.050 embodies many of the same principles as did its predecessor.

¶18 Other states have interpreted the crime of serving as an accessory after the fact in circumstances comparable to those present here. In *Tipton v. State*, 126 Tex. Crim. 439, 443-44, 72 S.W.2d 290 (1934), a witness before a grand jury falsely stated that she "knew nothing about" a homicide. The *Tipton* court held that the witness was not properly treated as an accomplice after the fact based upon this false statement. *Id.* at 444. In *State v. Clifford*, 263 Or. 436, 438, 441-42, 502 P.2d 1371 (1972), the Supreme Court of Oregon built on *Tipton* and held that a witness who responded to police questioning by falsely stating that he had not seen a murder suspect could not be convicted of being an accessory to the murder because the falsehood was not an "affirmative act" but was instead "a mere denial of knowledge."

¶19 In *Stephens v. State*, 734 P.2d 555 (Wyo. 1987), interpreting a statute very similar to RCW 9A.76.050, the Supreme Court of Wyoming held that "[a] mere denial of knowledge is to be differentiated from an ' "[a]ffirmative statement of facts tending to raise any defense for (the principal), or a statement within itself indicating an effort

to shield or protect (the principal)." ' " *Id.* at 557 (alterations in original) (quoting *Clifford*, 263 Or. at 441 (quoting *Tipton*, 126 Tex. Crim. at 444)); *see People v. Plengsangtip*, 148 Cal. App. 4th 825, 838, 56 Cal. Rptr. 3d 165 (2007) ("[A] statement that one *knows nothing* about a crime, even if false, is equivalent to a passive nondisclosure or refusal to give information, which is insufficient to support an accessory charge.").

¶20 We find that the foregoing interpretations illuminate the meaning of RCW 9A.76.050. The deception contemplated by RCW 9A.76.050(4) requires an affirmative act or statement; it does not encompass mere false disavowals of knowledge. *Cf. Plengsangtip*, 148 Cal. App. 4th at 839 ("Affirmative statements of positive facts are distinguishable from . . . a denial of knowledge that a crime occurred."). While the term "deception" may be literally broad enough to include false disavowals, such an interpretation would ignore the statutory scheme and past interpretations of the principles underlying the crime. Moreover, such an interpretation would ignore our holdings in *Williams* and its predecessors that statutes purporting to criminalize false statements made to law enforcement officers implicate constitutional guaranties of speech and privacy and will be narrowly construed.[3] *See* 171 Wn.2d at 483-84.

¶21 In sum, proving that an individual rendered criminal assistance by "[p]revent[ing] or obstruct[ing], by use of . . . deception, . . . an act that might aid in the discovery or apprehension" of another who has committed, or is sought for commission of, a crime or juvenile offense, RCW 9A.76.050(4), requires an affirmative act or statement that raises a defense for the other person, *see, e.g., Plengsangtip,*

---

[3] We decide this case on statutory, not constitutional, grounds. Narrowly construing statutes implicating constitutional guaranties is an aspect of statutory interpretation. In this case, we are not asked to declare, nor do we hold, that RCW 9A.76.050(4) is unconstitutional on its face or in application. Application of our holdings in *Williams* and its predecessors regarding when conduct is required in addition to speech is not before us in this case. Contrary to the dissent's assertion, this case does not require interpretation of the Washington Constitution.

148 Cal. App. 4th at 838; *People v. Duty*, 269 Cal. App. 2d 97, 104, 74 Cal. Rptr. 606 (1969), or which, in itself, indicates an effort to shield or protect the other person. A mere false disavowal of knowledge is insufficient. Accordingly, Budik's mere false disavowal of knowledge is insufficient to support his conviction for rendering criminal assistance.[4]

III.  There Is No Evidence of Prevention or Obstruction of Any Act Caused by Budik's False Statements

¶22  A second approach to this case yields the same result. Under RCW 9A.76.050, one essential element is demonstrating that the defendant "[p]revents or obstructs, by use of . . . deception, . . . anyone from performing an act that might aid in the discovery or apprehension" of an individual sought for commission of a crime. RCW 9A-.76.050(4). That is, the State had to prove that Budik's deception—assuming his false disavowal of knowledge was indeed a "deception"—actually prevented or obstructed the performance of some act that might have aided in discovery or apprehension of one of the shooters. The State produced no such evidence.

¶23  First, it is not at all clear that prevention or obstruction of the State from filing charges against another is included in RCW 9A.76.050(4). RCW 9A.76.050 derives from section 205.50 of the New York Penal Law. REV. WASH. CRIMINAL CODE at 319 (Legislative Council's Judiciary Comm. 1970). The provision in the New York Penal Law prohibits the prevention or obstruction of acts that "might aid in the discovery or apprehension of [another] person *or in the lodging of a criminal charge against him.*" N.Y. PENAL LAW § 205.50(4) (2010) (emphasis added). Our provision omits the italicized language, at least raising the inference that the legislature, in adopting it, intended to exclude from culpability for rendering criminal assistance those acts that

---

[4] We are not presented with the question of whether Budik would have been properly charged with making a false or misleading statement to public officials under RCW 9A.76.175 and reserve that question for the appropriate case.

merely prevent or obstruct the lodging of criminal charges against another person. *See State v. Edwards*, 104 Wn.2d 63, 68, 701 P.2d 508 (1985) (" '[W]here a material change is made in the wording of a statute, a change in legislative purpose must be presumed.' " (quoting *Graffell v. Honeysuckle*, 30 Wn.2d 390, 399, 191 P.2d 858 (1948))).

¶24 Second, there is no evidence in the record that Budik's false statements, as opposed to his nondisclosure of information, prevented or obstructed any act. RCW 9A.76-.050 includes within the definition of rendering criminal assistance "deception" that "[p]revents or obstructs" certain acts, RCW 9A.76.050(4); it does not include "nondisclosure" that "prevents or obstructs" certain acts. This is a critical distinction. If law enforcement officers are unable to act because an individual has not provided them with information, it is the nondisclosure of information that is preventing them from undertaking some act. This is not rendering criminal assistance. This is so whether or not the individual has also made a false statement to law enforcement officers. This is obviously to be distinguished from the situation in which the false statement itself prevents some act that might aid in the discovery or apprehension of another person. The relevant question therefore becomes whether some act would have been performed *but for* the false statement. If not, it cannot be said that the *deception* prevented or obstructed an act that might aid in the discovery or apprehension of another person.

¶25 The evidence the State relies upon to show prevention or obstruction is testimony from Detective Hollenbeck that it would have been "helpful" and that the investigation would "have been able to take a different turn" if Budik had told him that Nave was responsible for the shooting. 1 VRP at 144; 2 VRP at 184. This is clearly evidence that any prevention or obstruction of the performance of any act that might have aided in the discovery or apprehension of the shooters was caused by Budik's *nondisclosure*, not his false statements. There is simply no evidence in the record that

but for Budik's false disavowal of knowledge of the identity of the shooters (i.e., had he said nothing), anyone would have "perform[ed] an act that might aid in the discovery or apprehension" of one of the shooters. RCW 9A.76.050(4). As such, there is no evidence that Budik's deception—assuming his false disavowal of knowledge amounted to deception—caused the prevention or obstruction of any act.[5]

¶26 Even if Budik's false disavowal of knowledge of the shooter's identity amounted to deception under RCW 9A.76.050(4), there would be insufficient evidence to sustain his conviction.

## CONCLUSION

¶27 We hold that in order to prove that a defendant has rendered criminal assistance "by use of . . . deception," RCW 9A.76.050(4), the State must show that the defendant has made some affirmative act or statement; mere false disavowal of knowledge is insufficient to sustain a conviction for rendering criminal assistance. There is no evidence that Budik did more than falsely deny knowledge of the identities of the assailants who had shot him and shot and killed his companion. Accordingly, insufficient evidence supported Budik's conviction. We reverse the Court of Appeals and vacate Budik's conviction.

C. JOHNSON, CHAMBERS, FAIRHURST, STEPHENS, and WIGGINS, JJ., and ALEXANDER, J. PRO TEM., concur.

¶28 MADSEN, C.J. (concurring/dissenting) — I agree with the majority that Kenneth Budik's conviction for first degree rendering criminal assistance must be reversed because there is insufficient evidence to support the con-

---

[5] Similarly, though the State does not expressly rely upon any other false statement by Budik on appeal, we note that no evidence suggests that Budik's statement that he was leaning down at the time of the shooting, which we assume was false, prevented or obstructed any act.

viction. However, the majority's conclusion that RCW 9A-.76.050 requires an affirmative act or statement and that a false disavowal of knowledge cannot support a conviction under the statute is contrary to long-standing law. Accordingly, I concur in part and dissent in part.

## Analysis

¶29 Mr. Budik was charged with first degree rendering criminal assistance under RCW 9A.76.050(4). That provision requires proof that a person "[p]revents or obstructs, by use of force, deception, or threat, anyone from performing an act that might aid in the discovery or apprehension" of a person who has committed a murder or is sought as the perpetrator of that crime. RCW 9A.76.050(4), .070(1). The State's theory at trial was that Budik's false statements constituted deception. I agree.

¶30 When the first officer arrived at the scene he spoke with Budik, who was lying on the ground. Budik told the officer that he had been shot. Asked who shot him, Budik replied that he did not know. The officer thought Budik was evasive and hostile.

¶31 A second officer also spoke with Budik. He also thought Budik was evasive when he stated that he did not know what had happened. Police found a spent shell casing in the cab of the truck, which they interpreted as evidence that the shooter fired inside the truck in full view of Budik. An eyewitness told officers that Titus Davis was standing next to Adama Walton's truck when the shooting occurred, killing Walton.

¶32 Later, Detective Kip Hollenbeck interviewed Budik in the hospital. He explained to Budik that the evidence showed that the shooting had occurred very close to where he was sitting. Hollenbeck asked Budik to identify the shooter. Budik said he did not see anything and did not know why he and Walton had been shot. Budik told Hollenbeck that the shooting started after he bent down to

pick up his beer. But that story was inconsistent with Budik's left shoulder wound. Budik eventually refused to continue the interview. A couple of days after the shooting, Budik called Rae Walton, the murder victim's mother, and told her that Juwuan Nave was the shooter. Under these facts I believe there was sufficient evidence that Budik's false statements constituted deception.

¶33 However, the State was also required to establish that the deception prevented or obstructed anyone from performing an act that might aid in the discovery or apprehension of a person who committed or was being sought for committing a crime. RCW 9A.76.050(4). Here, I agree with the majority that the State's evidence fails. At trial the only evidence offered by the State was Detective Hollenbeck's agreement with the prosecutor's statement that the investigation would "have been able to take a different turn" had Budik reported that Nave was the shooter, as he asserted to Rae Walton. 2 Verbatim Report of Proceedings at 184.

¶34 Testimony revealed that Detective Hollenbeck was already aware of rumors that Nave was the shooter before he talked to Rae Walton, who merely reinforced that rumor. Three independent witnesses "eventually" came forward, persuading Hollenbeck that Davis was the shooter and that Nave was the fall guy. The trial testimony gives no clear indication of how quickly Davis was identified as the shooter. Hollenbeck also testified that he learned from another witness that Budik had been instructed to pin the blame on Nave, which created a reasonable inference that Budik called Rae Walton for that purpose. Even when viewed in the light most favorable to the State, I agree with the majority that the evidence on this element of rendering criminal assistance was insufficient and this justifies reversal.

¶35 Although I agree that Budik's conviction must be reversed, I disagree with the majority's interpretation of RCW 9A.76.050 that a false statement does not satisfy the statute.

¶36 In my view, RCW 9A.76.050 does not preclude a conviction where the defendant affirmatively provides false information to investigating authorities with the knowledge and intent required by the statute. Contrary to the majority's apparent belief, a false disavowal of knowledge about an offense can affirmatively assist the perpetrator of a crime. Imagine an individual who sees a murder committed by his close friend. When asked by the police, who know that the individual saw the murder, to protect his friend the individual falsely states that he does not know who committed the offense. He thereby deflects focus from the murderer, as intended, and so provides an opportunity and time for the murderer-friend to escape. By any reasonable construction of our statute, that individual just as surely renders criminal assistance as an individual who trips the pursuing officer to allow the murderer to escape.

¶37 This is, in fact, how many courts and commentators have concluded the offense can be committed. "[A]n affir-. mative falsehood to the public investigator when made with the intent to shield the perpetrator of the crime, may form the aid or concealment" that constitutes being an accessory after the fact.[6] *People v. Duty*, 269 Cal. App. 2d 97, 104, 74 Cal. Rptr. 606 (1969). Similarly, the court in *State v. Potter*, 221 N.C. 153, 19 S.E.2d 257 (1942), recognized that general rules must yield depending upon the circumstances. The court observed that while ordinarily failing to give information when knowing that a crime has been committed, or lying about one's knowledge regarding the commission of an offense, will not render the individual an accessory after the fact,

> "[w]here . . . concealment of knowledge of the fact a crime has been committed, or the giving of false testimony as to the facts is made for the purpose of giving some advantage to the perpetrator of the crime, not on account of fear, and for the fact

---

[6] The offense is often called being an accessory after the fact, as it was known under the common law. Under RCW 9A.76.050 the offense is rendering criminal assistance.

of the advantage to the accused, the person rendering such aid is an accessory after the fact."

*Id.* at 259 (quoting 14 Am. Jur. *Criminal Law* § 103, at 837).

¶38 As a leading commentator notes, the offense has typically required more than mere failure to report a felony, but among the acts that qualify an individual as an accomplice after the fact (one rendering criminal assistance) are "giving false testimony at an official inquiry into the crime, and giving false information to the police in order to divert suspicion away from the felon." 2 Wayne R. LaFave, Substantive Criminal Law § 13.6(a), at 402 (2d ed. 2003) (updated 2011) (footnote omitted). Thus, in *Duty*, 269 Cal. App. 2d at 101-04, the defendant's conviction was upheld where, with specific intent that an arson suspect avoid prosecution and to provide her an alibi, he falsely stated that she was with him and not in the vicinity of the crime.

¶39 The majority fails to adequately consider RCW 9A.76.050's purpose and intent, which is proscribing and punishing acts and statements that are accomplished with the intent to prevent, hinder, or delay apprehension of the offender. An affirmatively made, false disavowal of knowledge when questioned by investigating authorities is not the same as passive refusal to speak or false statements motivated by self-interest, neither of which is proscribed. An affirmative, false disavowal of knowledge, depending upon the individual's intent, can constitute rendering criminal assistance, and this is what the court should hold.

¶40 In reaching its contrary conclusion, the majority states that the five other means of committing rendering criminal assistance require some affirmative act or statement. This is incorrect because under RCW 9A.76.050(1) concealment of the offender can occur as a result of a defendant's false denial of knowledge about where the offender is or has gone. If the defendant knows that the offender is hiding in nearby shrubbery, but with intent to keep that location hidden he tells the police that he does not

know where the offender went, the defendant has affirmatively concealed the offender. Under the majority's interpretation, this concealment through a false statement of lack of knowledge will not support a conviction. The court should hold, instead, that a false statement of knowledge can support a conviction under the statute where the other requirements of the statute are met.

¶41 A conviction under RCW 9A.76.050(4) may be predicated on words alone, including a false disavowal of knowledge, provided those words are intended to and result in impeding discovery or apprehension of a person who has committed or being sought for committing a crime.


¶42 J.M. JOHNSON, J. (dissenting) — Federal and state constitutional guaranties of free speech and privacy do not protect the utterance of false and misleading statements to police during the course of a murder investigation. Kenneth Budik sat in the passenger seat while a shooter approached and fired through his window to kill the driver of the car. Budik not only repeatedly denied any knowledge of the identity of the shooter in this case, but he also provided a false account to police that later contradicted statements made to the victim's mother. As a result, investigating police were confused and unable to identify the perpetrator.

¶43 Additionally, the state legislature has the power to determine the tools available to law enforcement in bringing criminals to justice, including criminalizing "obstruct-[ing] . . . anyone from performing an act that might aid in the discovery or apprehension" by a law enforcement officer. RCW 9A.76.050(4). If the state legislature chose to further require an affirmative act or statement requirement as part of former RCW 9A.76.070 (2003), it could have done so in the text of the statute. I would hold that there is sufficient evidence to support Budik's conviction for first degree rendering criminal assistance and thus dissent.

## A. Freedom of Speech and Privacy

¶44 Article I, section 5 of the Washington State Constitution guarantees that "[e]very person may freely speak, write and publish on all subjects, being responsible for the abuse of that right." Although article I, section 5 generally "provides broader free speech protection than the first amendment to the United States Constitution," *JJR Inc. v. City of Seattle*, 126 Wn.2d 1, 8 n.6, 891 P.2d 720 (1995), "the inquiry must focus on the specific context in which the state constitutional challenge is raised," and "it does not follow that greater protection is provided in all contexts," *Ino Ino, Inc. v. City of Bellevue*, 132 Wn.2d 103, 115, 937 P.2d 154 (1997).

¶45 The nature of this case requires holding that state constitutional free speech protection in the criminal investigative context is no greater than that provided under the First Amendment to the United States Constitution. The United States Supreme Court has never directly addressed federal free speech protection in the criminal investigative context, but its case law in the commercial context is instructive. Commercial speech is not protected by the First Amendment if it is either unlawful or misleading. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566, 100 S. Ct. 2343, 65 L. Ed. 2d 341 (1980). Similarly, false and misleading statements made to police in the criminal investigative context are not protected under federal and state constitutional free speech provisions. This is because there is even greater public interest in deterring false statements in the criminal investigative context than there is in the commercial context. As the Court of Appeals aptly noted, "[W]hile Mr. Budik may not have had any obligation to speak, . . . if he chose to speak, he was not privileged to mislead police." *State v. Budik*, 156 Wn. App. 123, 128, 230 P.3d 1094, *review granted*, 170 Wn.2d 1008, 249 P.3d 624 (2010).

¶46 Article I, section 7 of our state constitution also provides that "[n]o person shall be disturbed in his private

affairs, or his home invaded, without authority of law."
While article I, section 7 " 'provides greater protection to
individual privacy rights than the Fourth Amendment to
the United States Constitution,' " *State v. Rankin*, 151
Wn.2d 689, 694, 92 P.3d 202 (2004) (quoting *State v. Jones*,
146 Wn.2d 328, 332, 45 P.3d 1062 (2002)), it focuses on
"those privacy interests which citizens of this state have
held, and should be entitled to hold, safe from governmental
trespass," *State v. Myrick*, 102 Wn.2d 506, 511, 688 P.2d 151
(1984). However, "[i]f no search occurs, then article 1,
section 7 is not implicated." *State v. Young*, 123 Wn.2d 173,
181, 867 P.2d 593 (1994). Here, Budik "was not the focus of
the investigation" and "was not a suspect or under arrest
when asked questions by the police." *Budik*, 156 Wn. App. at
130. Simple questioning by a police officer did not consti-
tute a search.

¶47 Unlike the majority's characterization, a literal
reading of the term "deception" does not require us to ignore
our holding in *State v. Williams*, 171 Wn.2d 474, 251 P.3d
877 (2011). Majority at 737. There, defendant Michael
Williams challenged his conviction of obstructing an officer
under RCW 9A.76.020, which makes it a crime " 'if [a]
person willfully hinders, delays, or obstructs any law en-
forcement officer in the discharge of his or her official
powers or duties.' " *Williams*, 171 Wn.2d at 477 (quoting
RCW 9A.76.020). Williams had provided law enforcement
with false self-identifying information, after leaving a car
dealership without paying for requested repairs, in order to
obscure an outstanding arrest warrant against him. *Id.* at
475-76. We held that the state constitution required "con-
duct in addition to pure speech in order to establish
obstruction of an officer" in this context. *Id.* at 485.

¶48 The difference between *Williams* and the current
case, however, is obvious; Budik was not a suspect at any
time during the course of the criminal investigation, and as
a result, the right against self-incrimination was never
implicated. *Budik*, 156 Wn. App. at 130; *see also Hoffman v.*

*United States,* 341 U.S. 479, 486, 71 S. Ct. 814, 95 L. Ed. 1118 (1951). Accordingly, the concerns regarding an "end run" around constitutional guaranties are not present because this case is significantly different from the " 'stop-and-identify' " statute that was condemned in *State v. White,* 97 Wn.2d 92, 96-97, 640 P.2d 1061 (1982). Instead, by creating a broader interpretation of free speech and privacy, the majority is weakening an important tool of law enforcement to investigate and punish wrongdoers and ensure community safety. We therefore should not read an affirmative act or statement requirement into the text of former RCW 9A.76.070, which the legislature did not include.

## B. Legislative Intent

¶49 As the majority indicates, our objective in this case is to determine the legislature's intent in enacting former RCW 9A.76.070, majority at 733, but "[t]he surest indication of legislative intent is the language enacted by the legislature, so if the meaning of a statute is plain on its face, we 'give effect to that plain meaning,' " *State v. Ervin,* 169 Wn.2d 815, 820, 239 P.3d 354 (2010) (internal quotation marks omitted) (quoting *State v. Jacobs,* 154 Wn.2d 596, 600, 115 P.3d 281 (2005)). "In determining the plain meaning of a provision, we look to the text of the statutory provision in question, as well as the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole.' " *Id.* (quoting *Jacobs,* 154 Wn.2d at 600). The majority's characterization of related provisions and the statutory scheme as a whole, however, does not compel a finding that the legislature intended to include an affirmative act or statement requirement, which it did not expressly include.

¶50 Admittedly, the text of RCW 9A.76.020 does not contain an affirmative act requirement. Still, the majority relies on this statute as evidence of the legislature's intent to the contrary. Majority at 735-36. We held in *Williams* that the state constitution required "conduct in addition to pure

speech in order to establish obstruction of an officer" under RCW 9A.76.020, *Williams*, 171 Wn.2d at 485, but the same concerns in *Williams* with former RCW 9A.76.070 are not present in this case. The majority is not justified in amending the statutory scheme of the legislature in former RCW 9A.76.070 when there is no constitutional infirmity in the statute's plain meaning.

¶51 The majority also points unconvincingly to other examples in the legislature's statutory scheme. Majority at 735. If anything, RCW 9A.76.175 demonstrates that the legislature knew how to include a material statement requirement as part of a statute and chose not to include a similar requirement in the text of former RCW 9A.76.070. The majority's citation to cases and statutes in other states also does not evidence intent on the part of the state legislature with respect to the statute at issue. Thus, this court should not read an affirmative act or statement requirement into former RCW 9A.76.070, and it should uphold Budik's conviction of first degree rendering criminal assistance.

## C. Sufficiency of the Evidence

¶52 In evaluating a sufficiency of the evidence challenge, "we view the evidence in the light most favorable to the prosecution and determine whether any rational fact finder could have found the essential elements of the crime beyond a reasonable doubt." *State v. Engel*, 166 Wn.2d 572, 576, 210 P.3d 1007 (2009). Here, Budik indicated to police on multiple occasions that he did not know who was responsible for the shooting of the driver sitting next to him. Budik even concocted a false account that "he bent over to get his drink" while "[s]omeone shot several rounds into the truck through the open passenger window." *Budik*, 156 Wn. App. at 126. This concocted story also conflicted with Budik's statements to the victim's mom that he knew who was responsible for the shooting constituted more than a simple disavowal. *Id.* The evidence of Budik's interactions

with the police demonstrated his methodical and deliberate attempt to confuse and delay the progress of the criminal investigation into the death.

¶53 Arguments regarding a lack of sufficiency with respect to the "deception" or "performing an act" elements of the statute are equally unpersuasive. As to the argument that Budik's statements were not deceptive, the spent casing that police found inside the cab of the truck and Budik's statements to the victim's mom that he knew who was responsible for the shooting sufficiently demonstrated the falsity of Budik's previous statements to police. *Id.* Additionally, the police did not have to actually believe all of Budik's statements in order for those statements to fulfill the "deception" element. Any resulting investigative confusion and delay and cost would be sufficient. As to the argument that there was no identifiable act that Budik's statements prevented the police from performing, the statute does not require the State to precisely pinpoint how the police investigation was interfered with. As a detective testified, Budik's false assertions caused delay and confusion and impeded the progress of the murder investigation. *See id.* at 127. Our cases require deferential review of the jury's verdict. Here, we should conclude that a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt especially if the evidence is viewed in the light most favorable to the prosecution, as required.

CONCLUSION

¶54 I would hold that former RCW 9A.76.070 does not contain a constitutional infirmity that justifies judicial amendment to include a new element, an affirmative act or statement. The constitutional guaranties of free speech and privacy do not protect false and misleading statements made to police during the course of a murder investigation. Because Budik said and did much to obstruct this murder

investigation, his statements were not mere disavowals. Thus, I would reject Budik's sufficiency of the evidence challenge and uphold his conviction under former RCW 9A.76.070. The issue was whether to believe Budik or believe the other witnesses. The jury considered all the evidence, and it unanimously found Budik guilty. For the foregoing reasons, I respectfully dissent.