IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 31408-1-III |
| Respondent, | ) | |
| v. | ) | |
| RICHARD PERALES, | ) | UNPUBLISHED OPINION |
| Appellant. | ) | |

SIDDOWAY, C.J. — Richard Perales was convicted of first degree rendering criminal assistance to Marcus Torres, a murder suspect, who eluded arrest for several weeks by hiding out in a makeshift outdoor shelter near the home in which Mr. Perales lived with Mr. Torres's mother. Mr. Perales challenges the trial court's refusal to give his proposed instruction addressing the State's burden of proving an "affirmative act or statement," which he argues is required by *State v. Budik*, 173 Wn.2d 727, 272 P.3d 816 (2012). He also challenges the sufficiency of the evidence to sustain the jury's verdict.

While it is a correct statement of law to say that rendering criminal assistance requires an affirmative act or statement, Mr. Perales's proposed instruction was confusing and incorrect, and the trial court's instructions were sufficient without it. Because we

find no abuse of discretion by the trial court in refusing to give the instruction and the evidence was sufficient to support a finding of guilt, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

Marcus Torres and his brother, Isaac Cruz,[1] were among five individuals suspected of being involved in the murder of Manuel Correa, which took place in Yakima County at the end of March 2012. Marcus and Isaac are both sons of Rosa Cruz-Torres, the girlfriend and roommate of the appellant, Richard Perales.

Following Mr. Correa's disappearance on March 30, the Yakima County sheriff's department began efforts to locate Marcus, Isaac, and the other suspects. Detectives learned that Marcus's mother and Isaac rented basement rooms at a rural home near Sunnyside owned by Christian Capener, and that Marcus also stayed at that address, at least occasionally.

Detectives investigating the Correa homicide first visited the Capener home, located at 121 Arrowsmith Road, to do a "knock and talk" in hopes of finding Marcus or Isaac. Isaac was found sitting outside in a car, after which detectives were able to get a warrant to search the home for evidence of the murder. Mr. Perales was present at the home during the execution of the search warrant.

---

[1] We refer to the two brothers by their first names for clarity. We intend no disrespect.

2

At trial, the State presented evidence that detectives, sheriff's deputies and Sunnyside police officers paid multiple visits to the Arrowsmith Road address during the several weeks they were looking for Marcus. The State also called a detective and a deputy sheriff who testified they spoke with Mr. Perales during that time frame and told him they were looking for Marcus in connection with the Correa murder. Detective Robert Enquist testified that he warned Mr. Perales he could be arrested if he were to harbor or conceal Marcus. Deputy William Boyer testified that when he spoke to Mr. Perales about the search for Marcus in connection with the murder, he asked Mr. Perales whether he understood "the serious nature of what was going on," and Mr. Perales answered that he did. Report of Proceedings (RP) at 388.

Sometime in the early morning of April 19, Deputy Boyer received word that Marcus had been seen a couple of hours earlier at the Arrowsmith Road home. The sheriff's department obtained a search warrant and Deputy Boyer began coordinating with "quite a few" members of the violent crimes task force to plan an approach to the property that would "safely contain the property and residence and then proceed with hopeful apprehension of Mr. Torres in a safe fashion." RP at 389.

Among task force members participating in the coordinated containment of the home on April 19 was Yakima Sheriff's Detective Robert Tucker, who arrived early, donned camouflage, and took up a position in an orchard on the property north of the

3

home. When he and others converged on the home, the detective followed a trail that connected the orchard and the home.

Marcus proved to be in the home, came out peacefully, and surrendered. After other task force members had secured the residence, Detective Tucker and another officer further investigated the trail leading to the orchard and discovered what prosecutors would later describe as a "foxhole" covered by an apple bin. Located within the hole, which was described by one officer as "[t]hree to four feet across and two to three feet deep," was a sleeping bag, a paper bag from a fast food restaurant, a partial pack of cigarettes, a couple of unopened cans of beer, a gray sweatshirt and a copy of the April 18, 2012 *Yakima Herald*. RP at 341.

Following the search and apprehension of Marcus, Mr. Perales was taken to the Sunnyside police department, where Detective Enquist read him his *Miranda*[2] rights and, after Mr. Perales agreed to speak, interviewed him. At trial, Detective Enquist testified to what Mr. Perales told him. Mr. Perales denied being aware that Marcus was hiding in a makeshift shelter in the orchard. But he admitted that when he arrived at the Arrowsmith Road home at around 10:30 p.m. the night before, having picked up some hamburgers and beer, he discovered that Marcus and his girlfriend were there. He admitted to the detective that because Marcus looked thirsty, he offered him some beers. Mr. Perales

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

claimed that he only spoke with Marcus for a few minutes before retiring to his and Ms. Cruz-Torres's room. About twenty minutes later, Marcus visited Mr. Perales's and Ms. Cruz-Torres's room and Mr. Perales offered him a couple more beers. Mr. Perales told Detective Enquist that he did not see Marcus again until he surrendered to officers the next morning.

At the close of the State's evidence, Mr. Perales moved to dismiss on grounds that the State had not shown that he committed any affirmative act of rendering criminal assistance. Citing *Budik*, he argued that the State must demonstrate an affirmative act or statement by a defendant to prove "rendering criminal assistance" within the meaning of the applicable statute. He argued that the shelter where Marcus was believed by the State to have hidden out was not on property owned or controlled by Mr. Perales and that there was no showing that Mr. Perales knew Marcus was staying in the hole, let alone that Mr. Perales had assisted in preparing it or been the source of provisions found in the hole. He argued that Mr. Perales was accused at most of failing to notify the sheriff's department of Marcus's presence on the night of April 18.

The court denied the motion to dismiss and prohibited the defense from arguing during closing that Mr. Perales was "required to commit some kind of affirmative act," adding that by "the same token[,] the State can't argue that he should have called [law enforcement]." RP at 405.

5

The court also refused to give two instructions proposed by Mr. Perales. The first stated:

> To harbor or conceal another is to provide shelter or lodging in order to conceal another clandestinely for the purpose of concealment. It is not enough to fail to disclose the location of the person sought or provide minimal financial assistance.

Clerk's Papers (CP) at 61. The second tracked the statutory definition of rendering criminal assistance as including harboring or concealing a suspect, and added,

> There must be an affirmative act or affirmative statement by the accused which sheds light on the nature of the affirmative act or statements relating to the harbor or concealment of the person sought.

CP at 63. The court instead gave instructions based on 11A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 120.10, 120.11 and 120.16, at 482-84, 495-96 (3d ed. 2008) (WPIC). It modified WPIC 120.16—the pattern instruction defining "rendering criminal assistance"—by defining "harbor" to mean "to give shelter or refuge to somebody" and "conceal" to mean "to place out of sight." CP at 73.

During deliberations, the jury sent out the following question: "Is it the defendant's legal responsibility to notify the police that the fugitive was [a]t 121 Arrowsmith [D]rive[?]" CP at 82. The trial court viewed the question as addressing an irrelevant matter given the nature of the charge, and responded that the jury should refer to its instructions.

The jury thereafter returned a guilty verdict. Mr. Perales appeals.

6

ANALYSIS

Mr. Perales's brief raises two separate but related issues. The first is whether the trial court erred by failing to give the second of his proposed instructions, which would have required proof of an "affirmative act or affirmative statement by [Mr. Perales] which sheds light on the nature of the affirmative act or statements relating to the harbor or concealment of the person sought." Br. of Appellant at 1. The second is a challenge to the sufficiency of the evidence. In both cases, Mr. Perales argues that the State fails to prove that a defendant has rendered criminal assistance when it fails to show a sufficient affirmative act or statement by the defendant.

A person commits the crime of criminal assistance in the first degree if he renders criminal assistance to a person who has committed or is being sought for murder in the first degree or any class A felony or equivalent juvenile offense. RCW 9A.76.070(1). "Render[ing] criminal assistance" is defined in RCW 9A.76.050 as comprising six types of assistance with the intent to "prevent, hinder, or delay the apprehension or prosecution of another person" who the accused knows "is being sought by law enforcement officials for the commission of a crime." Based on the plain language of RCW 9A.76.050, rendering criminal assistance "arises from actions intended to help an offender escape apprehension or prosecution." *State v. Davis*, ___ Wn.2d ___, 340 P.3d 820, 825 (2014).

In this case, the type of assistance alleged by the State was that Mr. Perales had "harbor[ed] or conceal[ed]" Marcus Torres within the meaning of RCW 9A.76.050(1).

7

*Sufficiency of jury instruction*

We first consider Mr. Perales's argument that the trial court erred in refusing to give the second of his proposed jury instructions, highlighting the need for the State to demonstrate an affirmative act or statement in order to prove that a defendant has rendered criminal assistance.

In general, we review a trial court's choice of jury instructions for an abuse of discretion. *State v. Hathaway*, 161 Wn. App. 634, 647, 251 P.3d 253 (2011). Jury instructions are sufficient if substantial evidence supports them, they allow the parties to argue their theories of the case, and, when read as a whole, they properly inform the jury of the applicable law. *State v. Clausing*, 147 Wn.2d 620, 626, 56 P.3d 550 (2002). It is not error for a trial court to refuse a specific instruction where a more general instruction adequately explains the law and allows each party to argue its case theory. *Hathaway*, 161 Wn. App. at 647.

Mr. Perales argues that his proposed instruction was appropriate in light of *State v. Budik*. Kenneth Budik was the victim of what was believed to be a gang-related shooting. When questioned by police, he denied knowing who fired the shots that injured him despite forensic evidence that the State believed suggested that the shooter had been close enough to be identified. For that reason, and because Budik later identified the shooter in speaking with the mother of a second victim, the State charged Budik with rendering criminal assistance by the means of "prevent[ing] or obstruct[ing], by use of

force, deception, or threat, anyone from performing an act that might aid in the discovery or apprehension" of a person sought by law enforcement officials. RCW 9A.76.050(4).

The Supreme Court reversed Budik's conviction, holding that Budik's mere disavowal of knowledge of the perpetrator of a crime, even if false, did not constitute "prevent[ing] or obstruct[ing], by use of . . . deception . . . anyone from performing an act that might aid in the discovery or apprehension" of a suspect. While acknowledging that the term "deception" might be "literally broad enough to include false disavowals," it concluded that the statutory scheme as a whole indicated the legislature's intent that "[t]he deception contemplated by RCW 9A.76.050(4) requires an affirmative act or statement." *Budik*, 173 Wn.2d at 737. It arrived at this interpretation of RCW 9A.76.050(4) after considering conduct constituting the former crime of serving as an accessory after the fact, the implications of constitutional concerns of speech and privacy, and—most relevant here—its observation that all six means of rendering criminal assistance provided by RCW 9A.76.050 "require some affirmative act or statement." 173 Wn.2d at 735.

The State argues that the holding of *Budik* does not apply to this case because the *Budik* court was solely concerned with the fourth statutory means of rendering criminal assistance, not "harboring or concealing," which is the first. We disagree. The Supreme Court spoke of all the statutory means as requiring an affirmative act or statement and the

9

discussion is not dicta, because that commonality in the means was a basis on which the Supreme Court interpreted the statute. *Id.* at 735.

The Supreme Court's holding that all six means of rendering criminal assistance require some affirmative act or statement does not help Mr. Perales, however, because the Supreme Court viewed an affirmative act as inherent in "harboring or concealing" a suspect. It explained:

> [U]nder the canon of noscitur a sociis, we construe a term in light of those terms with which it is associated. The five other means of rendering criminal assistance *require some affirmative act or statement, be it harboring or concealing the person sought,* RCW 9A.76.050(1); warning the person sought of impending discovery, RCW 9A.76.050(2); providing a sought person money, a disguise, transportation, or other means of evading discovery, RCW 9A.76.050(3); concealing, altering, or destroying physical evidence that would aid in discovery, RCW 9A.76.050(5); or providing the person sought with a weapon, RCW 9A.76.050(6). From this, we infer that the legislature similarly intended to require an affirmative act or statement in order to violate RCW 9A.76.050(4).

*Id.* at 735-36 (emphasis added) (citation omitted).

It would be a correct statement of law, in light of *Budik,* to say that "for harboring or concealing a person to constitute rendering criminal assistance, it requires some affirmative act or statement"—although the Supreme Court's reasoning in *Budik* views that proposition as self-evident, with the result that jury instruction on that score is unnecessary. But Mr. Perales's confusing proposed instruction suggests, misleadingly, that the State must prove multiple layers of affirmative conduct, *viz.,* there must be:

- An affirmative act or affirmative statement by the accused[,]

10

- Which sheds light on the nature of the affirmative act or statements[,]

- Relating to the harbor or concealment of the person sought.

*See* CP at 63. Mr. Perales's proposed instruction is not supported by *Budik* and is not a

correct statement of law.

The trial court employed Washington pattern instructions and added definitions of

"harbor" ("to give shelter or refuge to somebody") and "conceal" ("to place out of sight")

that reinforced the State's burden of showing affirmative conduct. The court addressed

the principal concern of *Budik* by ruling that the State could not argue that Mr. Perales

had an obligation to call police upon seeing Marcus on the night of April 18. We find no

error or abuse of discretion in the court's choice of jury instructions.

## Sufficiency of the evidence

We turn, then, to Mr. Perales's contention that insufficient evidence supports his

conviction. "Evidence is sufficient to support a conviction if, after viewing the evidence in

the light most favorable to the State, it allows any rational trier of fact to find all of the

elements of the crime charged beyond a reasonable doubt." *State v. DeVries*, 149 Wn.2d

842, 849, 72 P.3d 748 (2003). "All reasonable inferences from the evidence must be drawn

in favor of the State and interpreted most strongly against the defendant." *State v.

Bucknell*, 144 Wn. App. 524, 528, 183 P.3d 1078 (2008). Perhaps most important, given

the nature of the State's evidence in this case, is that "[i]n determining the sufficiency of

11

the evidence, circumstantial evidence is not to be considered any less reliable than direct evidence." *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

Direct evidence established that Mr. Perales was aware that Marcus was being sought in connection with a homicide and that Mr. Perales had been cautioned that he would be arrested if he harbored or concealed. Direct evidence established that when Mr. Perales returned home from running errands on the night before Marcus's arrest, he visited with Marcus twice and provided him with beer on both occasions. Detective Tucker also testified that as he lay in the orchard waiting and watching on the morning of April 19, he saw Mr. Perales and Ms. Cruz-Torres outside, speaking with each other and to another male who was inside the home and appeared at the back door. It was not long thereafter that Marcus came out of the home in response to police demands and surrendered.

While the direct evidence was sparse, it was presented along with circumstantial evidence that Marcus had been hiding out in a shelter constructed in the orchard north of the Cruz-Torres/Perales home, that he had provisions there, and that there was a "very distinct trail" running from the back of the Arrowsmith Road home to the area of the orchard where the shelter was located. RP at 364. From this, a jury could infer that the reason Marcus was staying in the orchard rather than somewhere else was because family members were providing him with support; from Mr. Perales's admission to visiting with Marcus and providing him with beers the night before, a jury could infer that Mr. Perales

No. 31408-1-III
*State v. Perales*

was one of the individuals providing Marcus with support. *Cf. State v. Brown*, 8 Wn. App. 639, 641-44, 509 P.2d 77 (1973) (evidence that an escaped prisoner was found hiding in defendant's home together with other circumstantial evidence was sufficient to submit to the jury the question of whether the defendant intentionally concealed the prisoner with the knowledge that he was an escaped prisoner).

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, C.J.

WE CONCUR:

_____
Brown, J.

_____
Korsmo, J.

13