# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 78856-6-I |
| Respondent, | DIVISION ONE |
| v. | PUBLISHED OPINION |
| FRANCISCO RUBEN MORENO, | |
| Appellant. | |

APPELWICK, J. — Moreno appeals his convictions for first degree burglary, fourth degree assault, and interfering with domestic violence reporting. He argues that knowledge of the unlawfulness of one's entry or remaining is an essential element of first degree burglary. He asserts that the State violated its discovery obligations and the court's discovery order by failing to identify the jail calls it intended to use at trial. Further, he argues that the court violated his right to present a defense when it refused to instruct the jury on self-defense. He also argues that the court miscalculated his offender score when it concluded that his burglary and assault convictions did not encompass the same criminal conduct. Last, he asserts that certain LFOs must be stricken from his judgment and sentence, and that a statutory citation must be corrected. We affirm Moreno's convictions, but remand for resentencing to correct his offender score and the statutory citation in his judgment and sentence.

FACTS

Francisco Moreno and Ashley Vollmar began dating in August 2017. Moreno moved into Vollmar's townhome in Everett that same month. Two months later, they found out they were expecting a child together.

According to Vollmar, she kicked Moreno out of her house and changed the locks at the end of October 2017. Despite kicking him out, she testified that she continued her relationship with him until January 2018. According to Moreno, he and Vollmar continued their relationship until early April 2018. He testified that she never changed the locks on him, and that he was welcome to live in her home throughout their relationship.

Vollmar testified that the morning of Sunday, April 8, 2018, she picked up a car that Moreno had taken from her garage earlier that week. She stated that he had come over Tuesday night to pick up his tribal check, and that her car was gone when she woke up the next morning. She explained that she retrieved her car on April 8 from a residence in Marysville. That same afternoon, she stated that Moreno called her looking for the car. She denied having it. She did not specify where she was when Moreno called her. When she was at home later that night, Vollmar missed a call from an unknown number. She called the number back, and it was Moreno. Despite telling him that he was not allowed at her home, she stated that he told her he was going to come over. She explained that he also started yelling at and threatening her. She testified, "He was saying he's going to beat my ass and I told him I was going to call the police."

Further, Vollmar testified that while she was on the phone with 911, she heard her door get kicked in. She explained that Moreno came up to her bedroom door, grabbed her, threw her on the bed, held her down by her neck so that she could not move, and took her phone out of her hand. She stated that she was eventually able to break free and run downstairs. As she was running down the stairs, she testified that Moreno grabbed her again and she fell to the ground on her knees and stomach. She explained that Moreno then ran out the front door, and she waited for the police to arrive.

In contrast, Moreno testified that he and Vollmar shared the car that he took from the garage. He also testified that he took the car on April 8, not earlier in the week. He explained that on April 8, he was doing laundry and barbecuing at Vollmar's house all day before driving the car to his ex-girlfriend's house at 3:00 p.m. to visit his son.[1] He stated that he had not seen Vollmar all day because she was at work. After visiting his son, he explained that he went to a bar around 8:00 p.m. He parked the car outside the bar with his phone, keys, and wallet inside. When he went outside to check his phone, he realized that the car was gone. He was then able to find someone to give him a ride to Vollmar's house.

When he arrived at the house, Moreno stated that he remembered he did not have his keys so he knocked on the door. After no one answered, he walked around to the back of the house and quickly ran up to the back door because he thought it was open. The door was locked, and he stated that he ended up going

---

[1] Moreno characterizes Vollmar's house as his house throughout his testimony. For clarity, we refer to it as Vollmar's house.

"right through the window." He testified that once he was inside, he went upstairs and turned on the light. At that point, he explained that Vollmar threw his phone at him, told him to leave, and told him she had called the police. He testified that he then started looking for his keys and wallet. He explained that Vollmar grabbed his wallet first, he tried to grab it back from her, and they ended up "kind of wrestling around over it." He stated that he ended up taking his wallet and walking outside. Once he was outside, the police blocked him from leaving.

The State charged Moreno with first degree burglary domestic violence, aggravated by domestic violence against a pregnant victim, fourth degree assault domestic violence, and interfering with domestic violence reporting.[2] At a June 29, 2018 pretrial hearing, Moreno asked the trial court to direct the State to provide him with a list of his jail telephone calls that it planned to use at trial. He reasoned that because a detective in the case had already listened to "60 days' worth of jail calls," it would be fair for the State to provide him with this information. The court asked the State to clarify whether it was intending "in [its] case in chief to use any of the jail calls." The State responded that it did not recall the calls being relevant, but that it needed to review a detective's report to make sure. The court ordered the State to "provide to the defense if it intends to use any jail phone calls by Mr. Moreno what date and phone calls it intends to use" by July 2, 2018. The State later gave notice that it did not intend to use the calls.

---

[2] The State also charged Moreno with two counts of second degree unlawful possession of a firearm. Moreno pleaded guilty to the first unlawful possession count, and the State dismissed the second unlawful possession count.

However, at trial, Moreno testified that he had been at Vollmar's house all day on April 8 before leaving to visit his son. The next day, the State sought to introduce excerpts from Moreno's jail calls in its rebuttal. The trial court found that Moreno's statements in two of those excerpts contradicted his testimony regarding his whereabouts on April 8. Moreno asked the trial court to disallow the evidence. He argued that the State's attempt to introduce the excerpts from his jail calls violated the court's discovery order and relevant case law. He also asked for a continuance so that he could listen to the calls.

The trial court ruled that excerpts "two and three" from Moreno's jail calls were proper rebuttal and impeachment testimony. It also ruled that the State did not violate the discovery order. Further, it denied Moreno's request for a continuance. Instead, it granted a recess to allow Moreno and his counsel to listen to the calls in the jury room.

At the close of evidence, Moreno asked the trial court to instruct the jury on self-defense. The court denied his request. A jury then found him guilty as charged. At sentencing, Moreno asked the court not to count his fourth degree assault conviction towards his offender score because his burglary and assault convictions constituted the same criminal conduct. The court disagreed and counted his assault conviction. On the first degree burglary conviction, it sentenced him to 48 months of confinement and 18 months of community custody. On the fourth degree assault and interfering with domestic violence reporting convictions, it sentenced him to 364 days of confinement for each conviction. It

ordered that the sentences for all three convictions run concurrently with one another. Last, the court imposed two legal financial obligations (LFOs).

Moreno appeals.

## DISCUSSION

Moreno makes six arguments. First, he argues that knowledge of the unlawfulness of one's entry or remaining is an essential element of first degree burglary. Second, he argues that the State violated its discovery obligations and the court's discovery order by failing to identify the jail telephone calls it intended to use at trial. Third, he argues that the court violated his right to present a defense when it refused to instruct the jury on self-defense. Fourth, he argues that the court miscalculated his offender score when it concluded that his burglary and assault convictions did not encompass the same criminal conduct. Fifth, he argues that certain LFOs must be stricken from his judgment and sentence. And sixth, he argues that a statutory citation in his judgment and sentence must be corrected.

I. Essential Element of First Degree Burglary

Moreno argues first that knowledge of the unlawfulness of one's entry or remaining is an essential element of first degree burglary. He contends that his conviction must be reversed, because the State failed to plead this element in the information and the trial court failed to instruct the jury on it.[3]

---

[3] Moreno failed to raise these arguments below. But, the sufficiency of a charging document may be challenged for the first time on appeal because it involves a question of constitutional due process. State v. Ward, 148 Wn.2d 803, 813, 64 P.3d 640 (2003). And, omitting an element of the crime charged in jury instructions is a manifest constitutional error under RAP 2.5(a)(3). State v. Scott, 110 Wn.2d 682, 688 n.5, 757 P.2d 492 (1988). As a result, we consider both arguments.

Criminal defendants have a constitutional right to be informed of the nature and cause of the charges against them. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. To be constitutionally adequate, a charging document must include all essential elements of the crime, both statutory and nonstatutory. State v. Kjorsvik, 117 Wn.2d 93, 101-02, 812 P.2d 86 (1991). An essential element is one whose specification is necessary to establish the very illegality of the behavior. State v. Johnson, 119 Wn.2d 143, 147, 829 P.2d 1078 (1992). The primary purpose of the rule is to give defendants sufficient notice of the charges so that they can prepare an adequate defense. Kjorsvik, 117 Wn.2d at 101. We review challenges to the sufficiency of a charging document de novo. State v. Williams, 162 Wn.2d 177, 182, 170 P.3d 30 (2007).

Further, the State must prove every essential element of a crime beyond a reasonable doubt for a conviction to be upheld. State v. Byrd, 125 Wn.2d 707, 713-14, 887 P.2d 396 (1995). "It is reversible error to instruct the jury in a manner that would relieve the State of this burden." Id. at 714. We review the legal sufficiency of jury instructions de novo. State v. Walker, 182 Wn.2d 463, 481, 341 P.3d 976 (2015).

Since it is the legislature that defines crimes, we first look to the relevant statute to determine the elements of the crime. State v. Gonzalez-Lopez, 132 Wn. App. 622, 626, 132 P.3d 1128 (2006). Our objective is to determine and give effect to the legislature's intent by ascertaining the plain meaning of the statute. State v. Budik, 173 Wn.2d 727, 733, 272 P.3d 816 (2012). In doing so, we look to the text of the provision, the context of the statute in which that provision is found, related

provisions, and the statutory scheme as a whole. Id. If the statute remains susceptible to more than one reasonable interpretation, it is ambiguous, and we look to the legislative history of the statute and the circumstances surrounding its enactment to determine legislative intent. Id. We review this criminal statute de novo. See id.

The first degree burglary statute provides in part,

A person is guilty of burglary in the first degree if, <u>with intent to commit a crime against a person or property therein, he or she enters or remains unlawfully in a building</u> and if, in entering or while in the building or in immediate flight therefrom, the actor or another participant in the crime (a) is armed with a deadly weapon, or (b) assaults any person.

RCW 9A.52.020(1) (emphasis added).

Moreno argues that burglary "requires a <u>knowing</u> unlawful entering or remaining." (Emphasis added.) He acknowledges that this court suggested otherwise in State v. Kilponen, 47 Wn. App. 912, 737 P.2d 1024 (1987). But, he states that we should decline to follow Kilponen because its conclusion was "unsupported by the facts." He also argues that first degree criminal trespass is a lesser included offense of first degree burglary. Because first degree criminal trespass requires knowledge of the unlawfulness of one's entry or remaining, he contends that "knowledge of the unlawfulness is an element of burglary" too.

In Kilponen, a jury found Kilponen guilty of first degree burglary. 47 Wn. App. at 913. On appeal, he argued that the first degree burglary instruction was erroneous "because it did not include all the elements of the crime charged, specifically, the requirement he knowingly made an unlawful entry into his own

8

home." Id. at 919. Because Kilponen's attorney proposed the instruction, this court noted that it need not consider his argument. Id. Still, it found that "RCW 9A.52.020 does not require the State to prove the defendant knew he was acting unlawfully." Id. It clarified that "[t]he intent required in the burglary statute is simply the intent to commit a crime against a person or property inside the burglarized premises." Id.

Kilponen's conclusion is not "unsupported by the facts," as Moreno suggests. The portion of RCW 9A.52.020 describing the required intent states that a person is guilty of first degree burglary if "with intent to commit a crime against a person or property therein, he or she enters or remains unlawfully in a building." RCW 9A.52.020(1). The plain language of the statute makes clear that a person must purposefully enter a building and intend to commit a crime therein, and their entry or remaining must be unlawful. It does not require that a person know their entry or remaining is unlawful.

Moreno's citation to the first degree criminal trespass statute bolsters this interpretation. The statute provides, "A person is guilty of criminal trespass in the first degree if he or she knowingly enters or remains unlawfully in a building." RCW 9A.52.070(1) (emphasis added). Unlike the first degree burglary statute, the legislature included the word "knowingly" before the phrase "enters or remains unlawfully in a building." If the legislature intended for first degree burglary to include a knowledge requirement, it would have placed the word "knowingly" in front of the same phrase. Instead, it made a deliberate choice not to include this

language in the burglary statute.  Thus, the legislature did not intend for the statute to require proof that a defendant knew he or she was acting unlawfully.

Moreno's argument that first degree criminal trespass is a lesser included offense of first degree burglary relies in part on State v. J.P., 130 Wn. App. 887, 125 P.3d 215 (2005).  There, this court cited State v. Soto, 45 Wn. App. 839, 727 P.2d 999 (1986), for the proposition that "[c]riminal trespass is a lesser included offense of burglary."  J.P., 130 Wn. App. at 895.  In Soto, this court held that first degree criminal trespass is a lesser included offense of second degree burglary. 45 Wn. App. at 841.  It explained that "[a] lesser included offense exists when all of the elements of the lesser crime are necessary elements of the greater crime." Id. at 840.  It noted that under the second degree burglary statute, "[t]he actor must, with intent to commit a crime against a person or property therein, enter or remain unlawfully in a building."  Id. at 841.  It further noted that first degree criminal trespass "requires the actor knowingly to enter or remain unlawfully in a building." Id.  Therefore, it concluded that second degree burglary requires intent, while first degree criminal trespass requires knowledge.  Id.  Because "[p]roof of a higher mental state is necessarily proof of a lower mental state," it reasoned that second degree burglary is necessarily proof of first degree criminal trespass.  Id.

However, the analysis in Soto was flawed.  First degree criminal trespass requires a person to know that their entry or remaining in a building is unlawful. But, the first degree burglary statute requires no such knowledge.  A person's entry or remaining must be factually unlawful.  The required mental state for first degree burglary is the intent to commit a crime against a person or property therein.

10

Compare RCW 9A.52.070(1), with RCW 9A.52.020(1). As a result, not all of the elements of first degree criminal trespass are necessary elements of first degree burglary. A person could commit all of the elements of first degree burglary, but not be guilty of first degree criminal trespass because they did not know that their entry or remaining was unlawful. Thus, to the extent our previous cases support that first degree criminal trespass is a lesser included offense of first degree burglary, we disagree with them and decline to follow them.

Knowledge of the unlawfulness of one's entry or remaining is not an element of first degree burglary. Accordingly, the information and jury instructions here were sufficient.

## II. State's Discovery Obligations

Moreno argues second that the State violated its CrR 4.7 discovery obligations and the trial court's discovery order by failing to identify the jail calls it intended to use at trial. Thus, he contends that the court erred in admitting the recordings and denying his motion for a continuance. He asserts that these errors deprived him of his rights to due process and a fair trial.

CrR 4.7 defines the discovery obligations of both the prosecution and defense. CrR 4.7(a)(1)(ii) specifically requires the State to disclose to the defendant "any written or recorded statements and the substance of any oral statements made by the defendant" no later than the omnibus hearing. While CrR 4.7 does not define the term "disclose," its general usage, the policies underlying the discovery rules, and CrR 4.7's provisions "indicate that 'disclose' includes

11

making copies of certain kinds of evidence." State v. Boyd, 160 Wn.2d 424, 433, 158 P.3d 54 (2007).

Courts have long recognized that access to evidence is a crucial element of due process and the right to a fair trial. Id. at 434. Thus, the State must disclose to the defense evidence that it intends to use not only for its case-in-chief but also for impeachment or rebuttal purposes. State v. Dunivin, 65 Wn. App. 728, 734, 829 P.2d 799 (1992). The trial court has wide discretion in ruling on discovery violations. State v. Linden, 89 Wn. App. 184, 189-90, 947 P.2d 1284 (1997). Therefore, we will not disturb a trial court's discovery ruling absent an abuse of discretion. Id. at 190. Even if the court commits a discovery error, the error is not reversible unless it materially affects the outcome of the trial. Id.

Moreno asserts that the State knew a crucial part of his defense to burglary was that "he still lived in Vollmar's house and was not unlawfully present." As a result, he argues that the State should have known there was a reasonable possibility that his statements in his jail calls indicating he was not at Vollmar's house on April 8 before the incident might be relevant. He relies on Dunivin and Linden.

In Dunivin, the State charged Dunivin with manufacturing marijuana. 65 Wn. App. at 729. Police initially became aware of marijuana growing near his property based on anonymous telephone tips. Id. at 729-30. They later discovered that the caller was Dunivin's son-in-law, Buis. Id. Buis told police that Dunivin was running a grow operation. Id. Before trial, Dunivin provided the State with a list of defense witnesses, including Buis. Id. After reviewing the list, the prosecutor

discovered that Buis had provided police with information about the grow operation, but did not disclose this information. Id. When Buis testified that he had never seen marijuana growing on or near Dunivin's property, the State cross-examined him about the information he gave police. Id. This was the first time Dunivin heard about Buis's participation in the investigation. Id. After a jury found Dunivin guilty, the court ruled that the State violated its discovery obligations and granted Dunivin's motion for a new trial. Id. at 731.

On appeal, the State argued that CrR 4.7(a)(1)(v), which requires a prosecutor to reveal to the defense any books, papers, or documents the prosecuting attorney intends to use at trial, did not apply because it "'had no intention of questioning Mr. Buis on these previous statements.'" Id. at 732. This court noted that even if the State expected Buis to avoid the topic of Dunivin's participation in the crime, "there was certainly a reasonable possibility that Buis would testify as he did." Id. at 733. And, it pointed out that the prosecution was ready to use the evidence to impeach Buis should his testimony contradict his prior statements. Id. This court held that the State's CrR 4.7 discovery obligations extend to evidence it intends to use for rebuttal or impeachment purposes, and that disclosure was therefore required. Id. at 733-34.

In Linden, the State charged Linden with violating the Uniform Controlled Substances Act, chapter 69.50 RCW, for cocaine possession. 89 Wn. App. at 188. At trial, it cross-examined him regarding his statements that he did not use cocaine. Id. The State then revealed at a sidebar that the day before Linden testified, it received a report indicating police recently found a vial of cocaine on Linden's

person. Id. Linden objected to the State using this report to impeach him, arguing that it violated the discovery rules by failing to disclose the report earlier. Id. He requested that the report be suppressed or that the trial court declare a mistrial. Id. at 188-89. The court ruled that the State had a duty to disclose the report as soon as it confirmed its existence, but that a mistrial was unnecessary. Id. at 189. A jury then heard the evidence and returned a guilty verdict. Id.

On appeal, this court reaffirmed its holding in Dunivin that CrR 4.7's disclosure requirements apply to impeachment and rebuttal evidence. Id. at 194. It also rejected the State's argument that "there was no 'reasonable possibility' it would use the police report at trial because it couldn't predict that Linden would make such 'sweeping' statements when testifying." Id. It explained that the situation was akin to Dunivin to the extent that Linden's testimony took a different course than anticipated.[4] Id.

The State counters that the reasoning in State v. Cole, 117 Wn. App. 870, 73 P.3d 411 (2003), applies here. There, the State charged Cole with second degree assault and attempted first degree robbery. Cole, 117 Wn. App. at 873. During the victim's testimony, he revealed for the first time that he had given Cole at least $7.00 from his wallet to get Cole out of his car. Id. at 879. Defense counsel then established that police found only $1.11 on Cole in a search incident to arrest, using a form that the State provided in discovery. Id. Later at trial, the State requested admission of a different document showing the amount of money found

---

[4] However, because it held that the trial court did not abuse its discretion in ruling that a mistrial was unnecessary, this court affirmed Linden's conviction. Linden, at 89 Wn. App. at 196-97.

on Cole was $13.11. Id. This document had not been provided in discovery. Id. at 879-80. Cole then moved for a mistrial. Id. at 880. The trial court denied his motion and admitted the evidence. Id.

On appeal, Cole argued that the State's withholding of the form recording $13.11 was a material breach of the discovery rule. Id. This court disagreed. Id. It noted that before his testimony, the victim had never mentioned to anyone that he gave Cole money during the incident. Id. It further explained,

> The State did not undertake to prove that Cole took any money from the victim, so the exact amount of money found on Cole after the attack was not material to the issue of his guilt. There is no indication in the record that the State planned to use either document at trial. Nor could the State have reasonably expected that these documents would be used at trial, when the victim had not told anyone that he gave Cole money.

Id. Thus, this court held that the trial court did not abuse its discretion in denying Cole's motion for a mistrial. Id.

Here, the issue is not whether the State violated the trial court's discovery order. That order compelled the State to disclose by July 2 which of Moreno's jail calls it intended to use at trial. The State complied with the order by giving notice that it did not intend to use any of the jail calls. It was not until Moreno testified at trial that those calls became relevant. At that point, the State knew the calls contradicted Moreno's testimony. As a result, the issue is whether the trial court abused its discretion by then admitting the excerpts from the jail calls into evidence.

At trial, Moreno testified that he had been at Vollmar's house all day on April 8 until he took the car from her garage to visit his son in the afternoon and go to a

bar that evening. He testified that he parked the car outside the bar, and that he realized it was gone when he went to get his phone from the car. In discussing the excerpts from Moreno's jail calls that were played for the jury at trial, the State explained that Moreno stated he had woken up somewhere, someone told him that his car had "just pulled out" and asked where his keys were, and he figured out he was laying on them. The State also explained that Moreno stated he was not even "staying at the house."

Moreno is correct that the State knew "a crucial part of [his] defense was that he still lived in the house with Ms. Vollmar." But, as the trial court explained,

> [Moreno's] testimony . . . was not just that this is his residence, but that he was there on the 8th, that he had woken up there that morning. I find that excerpts 2 and 3 [of the jail calls] contradict those particular statements. I understand your point that the overall argument was that he lived there. I think these rebuttal statements are significantly more particular as to his exact testimony about what happened throughout the day on April 8th.

Moreno has not met his burden of showing that the trial court abused its discretion in admitting the excerpts from his jail calls into evidence. In light of Moreno's new testimony, the trial court was free to evaluate whether the excerpts became relevant and allow the State to use them to impeach Moreno. Further, the court granted a recess to allow Moreno to listen to the calls before they were admitted. Moreno does not show prejudice from the denial of his motion for a continuance to listen to the calls.

Because the trial court did not err in admitting the excerpts and denying Moreno's motion, it did not deprive Moreno of his rights to due process and a fair trial.

16

III.    Self-Defense Instruction

Moreno argues third that that the trial court violated his right to present a defense when it refused to instruct the jury on self-defense.

Moreno is entitled to an instruction on his theory of the case if there is evidence to support that theory. State v. Fisher, 185 Wn.2d 836, 849, 374 P.3d 1185 (2016). Generally, a defendant is entitled to a self-defense instruction if there is some evidence demonstrating self-defense. State v. Werner, 170 Wn.2d 333, 336-37, 241 P.3d 410 (2010). To prove self-defense, there must be evidence that (1) the defendant subjectively feared that he was in imminent danger of death or great bodily harm, (2) this belief was objectively reasonable, and (3) the defendant exercised no greater force than reasonably necessary. Id. at 337. We evaluate the sufficiency of the evidence "by determining what a reasonable person would do standing in the shoes of the defendant." Id. Because the defendant is entitled to the benefit of all the evidence, a self-defense instruction may be based on facts inconsistent with the defendant's testimony. Fisher, 185 Wn.2d at 849.

"The question of whether the defendant has produced sufficient evidence to raise a claim of self-defense is a matter of law for the trial court." State v. Janes, 121 Wn.2d 220, 238 n.7, 850 P.2d 495 (1993). Here, the trial court's refusal to give a self-defense instruction was based on a lack of evidence supporting the defense. Thus, we review whether Moreno was entitled to a self-defense instruction de novo. See Fisher, 185 Wn.2d at 849. If the trial court erred in refusing to give the instruction, the error is reversible only if it prejudiced Moreno. See Werner, 170 Wn.2d at 337.

17

Moreno points to his testimony that when he turned on the light in Vollmar's house, she threw his phone at him. He also cites his testimony that he and Vollmar ended up "kind of wrestling" over his wallet. Based on this evidence, he contends that the jury could have found any touching was in response to Vollmar throwing the phone at him, or him trying to retrieve his wallet from her hands.

Even if we were to assume that any nonconsensual touching took place in response to Vollmar throwing his phone or taking his wallet, Moreno's testimony does not demonstrate that he subjectively feared he was in imminent danger of death or great bodily harm. Nor does he point to other evidence suggesting that he feared Vollmar. There must be some evidence that a defendant subjectively feared he was in imminent danger of death or great bodily harm to receive a self-defense instruction. See Werner, 170 Wn.2d at 337. Moreno was not entitled to a self-defense instruction, and the trial court did not err in refusing to give one.

## IV. Offender Score Calculation

Moreno argues fourth that the trial court erred in concluding that his burglary and assault convictions did not encompass the same criminal conduct. He therefore contends that the court miscalculated his offender score by counting each conviction separately.

In calculating an offender score, the trial court counts a defendant's current and prior convictions. RCW 9.94A.589(1)(a). The offender score for a defendant's current offense includes all other current offenses unless "the court enters a finding that some or all of the current offenses encompass the same criminal conduct." Id. "Same criminal conduct" means "two or more crimes that require the same

criminal intent, are committed at the same time and place, and involve the same victim." Id. "The relevant inquiry for the intent prong is to what extent did the criminal intent, when viewed objectively, change from one crime to the next." State v. Tili, 139 Wn.2d 107, 123, 985 P.2d 365 (1999). A sentencing court's determination of same criminal conduct will not be disturbed unless it abuses its discretion or misapplies the law. State v. Aldana Graciano, 176 Wn.2d 531, 536, 295 P.3d 219 (2013).

The burglary and assault here included the same victim, Vollmar, and occurred at the same place, her home, at the same time. Moreno and the State dispute only whether the two convictions required the same criminal intent. The trial court instructed the jury that to convict Moreno of first degree burglary, it had to find in part that he entered or remained in the house "with intent to commit a crime against a person or property therein." It further instructed the jury that an assault "is an intentional touching or striking of another person that is harmful or offensive regardless of whether any physical injury is done to the person."

In determining that Moreno's burglary and assault convictions did not constitute the same criminal conduct, the trial court likened this case to State v. Lessley, 118 Wn.2d 773, 827 P.2d 996 (1992). There, the Washington Supreme Court held that burglary and kidnapping were not the same criminal conduct because the intent was not the same for both crimes. Id. at 778. It stated that "the objective intent of Lessley's burglary was completed when he broke into the Thomas residence armed with a deadly weapon." Id. It explained, "'Crimes which he objectively intended to commit [in the Thomas residence] included the property

19

damage caused when he broke in, the assault against Mr. Thomas, and the assaults against Mrs. Thomas and his former girlfriend, Dorothy Olson.'" Id. (alterations in original) (quoting State v. Lessley, 59 Wn. App. 461, 468-69, 798 P.2d 302(1990)). The court stated that it would only be speculating to assume that Lessley's subjective intent was to kidnap and assault his former girlfriend. Id. Thus, it found that "Lessley's criminal intent changed when he moved from the burglary to the kidnapping; the former did not further the latter." Id.

The trial court reasoned that Lessley "is akin to the testimony here . . . as to the basis for essentially the property damage to the door, the intent to retrieve items that had been in the vehicle, and then subsequently what resulted in the assault that was ultimately charged." But, Moreno points out that the State argued Moreno's intent during the burglary was to assault Vollmar.

Indeed, during closing argument, the State addressed the intent element of first degree burglary and asserted that Moreno's intent in going to Vollmar's house was to assault her. It stated,

> [T]he State has to prove that [Moreno] went there and entered that home unlawfully with the intent to commit a crime. We know that that was his intent because he told [Vollmar] what his intent was. Not only do you have that evidence of her testimony, but you have the 911 call to back it up because she was frightened. You can hear it in her voice. When she called 911, she did not want him coming to her house. Why was she so frightened? Because he had called and threatened to beat her before he got there.

Viewed objectively, the State's evidence shows that Moreno's intent did not change from the burglary to the assault. The record demonstrates that Moreno told Vollmar he was going to go to her house and beat her, and that he grabbed

20

her, threw her on a bed, and held her down once he arrived. Unlike Lessley, the former offense furthered the latter. Accordingly, the trial court abused its discretion in determining that Moreno's burglary and assault convictions did not constitute the same criminal conduct. We therefore remand for resentencing.[5]

V.   Legal Financial Obligations

A.  Domestic Violence Penalty Assessment

Moreno contends that the $100 domestic violence penalty assessment must be stricken from his judgment and sentence because the trial court found that he was indigent.

RCW 10.01.160(3) states that "[t]he court shall not order a defendant to pay costs if the defendant at the time of sentencing is indigent." But, the domestic violence penalty assessment is not a cost of prosecution under RCW 10.01.160. State v. Smith, 9 Wn. App. 2d 122, 127, 442 P.3d 265 (2019). Thus, Moreno's indigence does not dictate whether the fee is applicable. Id. A trial court's ultimate decision of whether to impose LFOs is reviewed for abuse of discretion. Id. at 126. RCW 10.99.080(5) encourages, but does not require, judges to solicit input from the victim or representatives for the victim in assessing the ability of the convicted offender to pay the penalty. The court did not solicit such input at sentencing. But,

---

[5] The State points out that the burglary antimerger statute permits courts to punish and prosecute separately crimes committed during the commission of a burglary. RCW 9A.52.050. In Lessley, the Washington Supreme Court held that the statute gives a sentencing judge discretion to punish for burglary, even where burglary and an additional crime encompass the same criminal conduct. 118 Wn.2d at 781. Here, however, the trial court did not address its authority to punish Moreno separately for burglary. As a result, it is unclear whether the court would have exercised its discretion to do so, and we will not assume that it would have.

because this inquiry is not required, the court did not abuse its discretion in imposing the assessment.

B. Interest Accrual Provision

Moreno also contends that the provision in his judgment and sentence imposing interest on nonrestitution LFOs must be stricken. Citing RCW 10.82.090, his judgment and sentence provides that "[t]he financial obligations imposed . . . shall bear interest from the date of the judgment until payment in full at the rate applicable to civil judgments." Under RCW 10.82.090(1), no interest shall accrue on nonrestitution LFOs as of June 7, 2018. Moreno's judgment and sentence was entered over two months later on August 13, 2018. Thus, the change in the law had taken effect. The citation to RCW 10.82.090 makes clear that no interest can accrue on Moreno's nonrestitution LFOs. Accordingly, we need not remand to strike the provision.

VI. Statutory Citation in Judgment and Sentence

Moreno argues last that his judgment and sentence reflects the wrong statutory subsection for count one and must be corrected. A first degree burglary conviction may be based on the defendant being "armed with a deadly weapon" under RCW 9A.52.020(a), or "assault[ing] any person" under RCW 9A.52.020(b). Here, the State charged Moreno with first degree burglary based on his assault of Vollmar. However, Moreno's judgment and sentence states that the jury found him guilty of first degree burglary under the subsection that refers to being armed with a deadly weapon. The remedy for a scrivener's error in a judgment and sentence is remand to the trial court for correction. State v. Sullivan, 3 Wn. App. 2d 376,

22

381, 415 P.3d 1261 (2018). Therefore, we instruct the trial court on remand to correct the citation in Moreno's judgment and sentence to reflect that he was found guilty of first degree burglary under RCW 9A.52.020(b).

We affirm Moreno's convictions, but remand for resentencing to correct his offender score and the statutory citation in his judgment and sentence.

Appelwick, J.

WE CONCUR: