IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| BSRE POINT WELLS, LP, | No. 83820-2-I |
| Respondent/Cross-Appellant, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| SNOHOMISH COUNTY, | |
| Appellant/Cross-Respondent. | |

DíAZ, J. — BSRE Point Wells, LP ("BSRE") applied to develop an "urban center" on a former large industrial site in Snohomish County beginning in 2011. The Snohomish County Planning and Development Services Department ("Planning Department"), the Snohomish County Hearing Examiner ("Hearing Examiner"), and the Snohomish County Council ("Council"; together, the "County") all concluded that "substantial conflicts" existed between BSRE's application and the relevant portions of the Snohomish County Code (Chapter 30.34A; the "Code" or "SCC"), and denied each such application, most recently in April 2021 (the "Council's Decision" or the "Decision"). BSRE filed the instant (second) Land Use Petition Act ("LUPA") petition ("Petition"), pursuant to RCW 36.70C, challenging the Decision in King County Superior Court. The superior court made no ruling on the merits on any aspect of the Council's Decision and, in the court's order in February 2022

Citations and pin cites are based on the Westlaw online version of the cited material.

("Order"), remanded the case to the County for a second time, ordering the Hearing Examiner to consider BSRE's application in "good faith." Snohomish County and BSRE each appealed.

Both parties ask this court to consider the merits of the Council's Decision. Specifically, the County asks this court to reverse the superior court's Order because it made no ruling on the merits at all and, after considering the merits, to affirm the Decision denying the application. BSRE seeks reversal of the superior court's Order because it did not find on the merits that BSRE satisfied the Code, and also seeks reversal because it failed to find that SCC 30.61.220 violates state law.

We conclude that the superior court erred in not ruling on the merits and that BSRE did not carry its burden in establishing that each of the five alleged substantial conflicts were an erroneous interpretation of the County's own Code. We thus reverse and remand the case to dismiss BSRE's LUPA Petition.

## I.    FACTS

In 2011, BSRE applied to develop an area of land in Snohomish County known as Point Wells into an "urban center" with residential and commercial buildings.[1] In 2013, the County's Planning Department notified BSRE of dozens of conflicts between its application and the Code. In April 2017, BSRE resubmitted its application. In October 2017, the Planning Department again notified BSRE that it failed to resolve the conflicts

---

[1] For additional detail on the early procedural posture of this matter, see BSRE Point Wells, LP v. Snohomish County, No. 80377-8-I, slip. op. (Wash Ct. App. Feb. 8, 2021) (unpublished) https://www.courts.wa.gov/opinions/pdf/803778.pdf, from which this and the following two paragraphs are drawn.

with the code. BSRE thereafter requested three extensions of a new application deadline, which were granted, and a fourth extension, which the County denied. On April 17, 2018, the County's Planning Department recommended that BSRE's application be denied based on eight "substantial conflicts" with the Code. The Hearing Examiner for the County held its (first) hearing on BSRE's application in May 2018. The Hearing Examiner denied the application based on five remaining substantial conflicts. BSRE appealed to the County Council, which affirmed the Hearing Examiner's decision.

BSRE appealed for the first time to King County Superior Court under LUPA, seeking reversal of the denial of its application for procedural reasons, and a ruling on the merits. In June 2019, the superior court reversed the Hearing Examiner's dismissal of BSRE's first application, not on the merits, but because it found that BSRE was entitled to reactivate its application "one-time," if it submitted its revised materials within six months of the court's decision.

BSRE appealed for the first time to this court ("First LUPA") and contemporaneously submitted its revised application materials by the six-month deadline. This court dismissed the First LUPA because it was not ripe, finding that, while the issues were mainly legal and no further factual development was needed, BSRE had not exhausted its administrative remedies as it had reactivated its application, and the application and review process was not complete. BSRE Point Wells, LP, No. 80377-8-I, slip op. at 5.

BSRE submitted the instant application in December of 2019. In May 2020, the Planning Department recommended that the Hearing Examiner deny BSRE's application

3

again. In November 2020, the Hearing Examiner conducted a second six-day hearing, including witness and public testimony. On January 29, 2021, the Hearing Examiner denied the application again, citing five substantial conflicts with the Code. BSRE appealed to the Council. The Council affirmed in April 2021. BSRE appealed to the King County Superior Court, filing a second LUPA petition (again, "Petition"). The City of Shoreline ("Shoreline") also intervened.

On February 22, 2022, the superior court entered its Order Remanding with Directives granting the Petition (again, the "Order"), after hearings on November 5, 2021, and December 10, 2021. The superior court found ". . . a lack of good faith in the processing and review of the application upon reactivation and thus, a lack of compliance with Judge McHale's Order on Remand." The superior court, sua sponte, imposed a 12-month timeline on remand, giving BSRE six months to submit its initial revisions to its applications, four months for the County to provide a comment letter, and two months for BSRE to submit any further revisions, without identifying any particular substantive issue BSRE or the County should focus on. The superior court reiterated its "good faith" requirement, ordering that "[t]he parties shall act in good faith and shall engage in meaningful and substantive discussions about the applications and their revisions throughout the review process." The superior court otherwise did not consider the merits of the five conflicts with the Code identified by the Hearing Examiner.

On March 18, 2022, the County filed its present Notice of Appeal. On March 25, 2022, BSRE filed its Notice of Cross Appeal.

4

II.   ANALYSIS

A. Ripeness

First, we consider whether the instant Petition based on the Decision is now ripe. A claim is ripe for appellate review if the issues raised are primarily legal, do not require further factual development, and the challenged action is final. State v. Cates, 183 Wn.2d 531, 534, 354 P.3d 832 (2015) (quoting State v. Sanchez Valencia, 169 Wn.2d 782, 786, 239 P.3d 1059 (2010)). Courts also consider the hardship incurred by the appellant if the court refuses to review the claim. As mentioned above, this court previously concluded that two requirements of the ripeness doctrine were satisfied by the time of the First LUPA petition: the issues were mainly legal and no further factual development was needed. BSRE Point Wells, LP, No. 80377-8-I, slip op. at 6. These two conclusions apply to the present Decision, which returns with no material further legal or factual development, other than the unfortunate passage of time.

The only question then is whether the appeal process is "final." Previously, this court dismissed the appeal because BSRE's revised application was pending before the County. Since then, there is no evidence in the record that BSRE has refiled its application. Therefore, there is no pending administrative review to exhaust. Importantly, BSRE and the County both agree that the appeal is ripe for review and explicitly ask this court to rule on the merits of the Decision. Additionally, the County and BSRE concur that they would suffer hardship if this court does not rule on the merits, as there is no shared understanding of the applicable substantive standards, and further process is a drain on the time and resources of the parties. Br. of Appellant at 20; Br. of Resp't at 16;

5

Cates, 183 Wn.2d at 534 (courts should consider whether the parties will incur hardship if the court refuses to review the claim) (citations omitted). Further, LUPA contemplates such direct review, even if the parties did not, for reasons unknown, avail themselves of this process. See RCW 36.70C.150[2] and RAP 6.4.[3] Finally, sending the Decision back to the County for a (minimum) one-year delay would not be consistent with legislative intent for timely judicial review under LUPA. See RCW 36.70C.010 ("The purpose of this chapter is to reform the process for judicial review of land use decisions made by local jurisdictions by establishing . . . expedited appeal procedures . . . in order to provide . . . timely judicial review."). Therefore, we conclude that this appeal based on the Decision is ripe for review on the merits.

B. Background on LUPA Petitions

1. BSRE Bears the Burden

As a preliminary matter, we consider who bears the burden in a LUPA appeal. LUPA requires courts to review the decision of the local jurisdiction's body or officer with the highest level of authority to make the determination. Citizens to Preserve Pioneer Park, L.L.C. v. City of Mercer Island, 106 Wn. App. 461, 470, 24 P.3d 1079 (2001). Thus, we review the April 5, 2021 Decision of the County Council, which affirmed the January 29, 2021 Decision of the Hearing Examiner.

---

[2] RCW 36.70C.150 provides in part: "The superior court may transfer the judicial review of a land use decision to the court of appeals upon finding that all parties have consented to the transfer to the court of appeals and agreed that the judicial review can occur based upon an existing record."

[3] RAP 6.4 states: "The appellate court accepts direct review of a Land Use Petition Act proceeding according to the procedures set forth in chapter 36.70C RCW. A case that has been certified for review by the superior court is treated as a direct appeal."

"On appeal, the party who filed the LUPA petition bears the burden of establishing one of the errors set forth in RCW 36.70C.130(1), *even if that party prevailed* on its LUPA claim in superior court." Quality Rock Products, Inc. v. Thurston County, 139 Wn. App. 125, 134, 159 P.3d 1 (2007) (emphasis added) (citations omitted). Here, BSRE filed the Petition.

BSRE, nonetheless, argues that the County bears the burden because SCC 30.61.220 states that where there is "reasonable doubt that the grounds for denial are sufficient," a hearing examiner must deny the County's request to deny the application. The County argues it is BSRE's burden to show that it is entitled to the requested relief, not just on one of the substantial conflicts, but on all five.

We find that it is BSRE's burden to find error in each of the five substantial conflicts because "[t]he plain words of the statute make clear that it is [the petitioner's] burden to establish that [it] is entitled to relief under one or more of the specified subsections of the LUPA statute." Nagle v. Snohomish County, 129 Wn. App. 703, 707-08, 119 P.3d 914 (2005). Whatever the standard of review may be for the hearing examiner at that stage of the process, the burden is on the petitioner at this stage of a LUPA action to show that each of the substantial conflicts found by the Council violated LUPA.

### 2. LUPA's Substantive Principles

Four important principles guide our review of the Petition. First, when reviewing a superior court's decision under LUPA, the court stands in the shoes of the superior court and "review[s] the hearing examiner's action de novo on the basis of the administrative record." Girton v. City of Seattle, 97 Wn. App. 360, 363, 983 P.2d 1135 (1999). In other

words, even where a superior court ruled on the merits, a court of appeals reviews the decision of the local jurisdiction without reference to the superior court decision. Rosema v. City of Seattle, 166 Wn. App. 293, 297, 269 P.3d 393 (2012).

Second, the court next views evidence in the light most favorable to "the party who prevailed in the highest forum that exercised *factfinding* authority, a process that necessarily entails acceptance of the factfinder's views regarding the credibility of witnesses and the weight to be given reasonable but competing inferences." City of University Place v. McGuire, 144 Wn.2d 640, 652, 30 P.3d 453 (2001) (emphasis added). Here, the highest fact finder is the Hearing Examiner and the County prevailed before it. Thus, all facts determined by the Hearing Examiner should be viewed in the light most favorable to the County.

Third, the County is granted deference as to how it construes its own laws under its expertise pursuant to RCW 36.70C.130(1)(b). Timberlake Christian Fellowship v. King County, 114 Wn. App. 174, 180, 61 P.3d 332 (2002) (describing the deference as "substantial"). Stated slightly differently, the County's interpretation of its law is accorded "great weight where the statute is within the agency's special expertise." Cornelius v. Wash. Dep't of Ecology, 182 Wn.2d 574, 585, 344 P.3d 199 (2015) (review under the Administrative Procedure Act) (citations omitted). Here, there is no dispute that the relevant portion of the Code is highly technical and the County's Planning Department has expertise in this area. Our review of the County's understanding of its own law is, at a minimum, substantially deferential and perhaps greatly deferential. In turn, a court should not substitute its judgment for that of county decision-makers. Schofield v.

8

Spokane County, 96 Wn. App. 581, 589, 980 P.2d 277 (1999) (where the petitioner is challenging the application of law to facts). Rather, a court "must be left with the definite and firm conviction that a mistake has been committed." Id. (internal quotations and citation omitted).

Fourth, and most substantively, in a LUPA action, a court may grant relief only if the petitioner has carried the burden of establishing that one of the standards set forth in (a) through (f) of RCW 36.70C.130(1) has been met. Thus, BSRE has the burden of establishing that:

> (a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;
> (b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;
> (c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;
> (d) The land use decision is a clearly erroneous application of the law to the facts;
> (e) The land use decision is outside the authority or jurisdiction of the body or officer making the decision; or
> (f) The land use decision violates the constitutional rights of the party seeking relief.

Here, BSRE in general argues that it established that each of the first five types of errors occurred ((a)-(e)) with respect to each of the five substantial conflicts the Hearing Examiner identified. However, BSRE's argument turns primarily on RCW 36.70C.130(1)(b) and (d) as the basis for its appeal, i.e., the County erroneously interpreted its own laws or clearly erroneously applied its own law to the facts here. Furthermore, BSRE's arguments focus on just two of the five substantial conflicts as its "main" arguments, as will be described below.

9

C. Background on and Key Provisions of the Snohomish County Code

In May 2010, the Snohomish County Council passed Amended Ordinance No. 09-079, which updated the SCC to establish a new zone for "urban centers" and defined the standards for urban center design. In accordance with Washington's Growth Management Act ("GMA") at chapter 36.70A RCW,[4] the County expressed its intent to reduce sprawl and "encourage growth in urban areas served by a multimodel transportation system."

In addition to modifying some of its existing zoning requirements, Former SCC 30.21.020 (2010) created an "urban center" zone (a.k.a., "UC zone"). The County's intent for the UC zone was to:

> [P]rovid[e] a zone that allows a mix of high-density residential, office and retail uses with public and community facilities and pedestrian connections located within *one-half mile of existing or planned stops or stations for high capacity transit routes* such as light rail or commuter rail lines, regional express bus routes, or transit corridors that contain multiple bus routes or which otherwise provide *access* to such transportation[.]

Former SCC 30.21.025(1)(f) (2010) (emphasis added). Indeed, the UC zone was specifically created with the Point Wells site in mind.

---

[4] RCW 36.70A.011 explains the State Legislature's purpose in enacting the GMA:

> The legislature finds that uncoordinated and unplanned growth, together with a lack of common goals expressing the public's interest in the conservation and the wise use of our lands, pose a threat to the environment, sustainable economic development, and the health, safety, and high quality of life enjoyed by residents of this state. It is in the public interest that citizens, communities, local governments, and the private sector cooperate and coordinate with one another in comprehensive land use planning.

To facilitate its plan for the UC zone, the County added a new chapter to the SCC, Section 30.34A, outlining the standards it would use to "encourage higher density *transit- and pedestrian-oriented development that provides a mix of uses and encourages high quality design.*" Former SCC 30.34A.010 (2010) (emphasis added). These standards outlined how urban centers would be developed, including specific requirements such as building height and setbacks, access to public transportation, and the County's review and decision criteria.

Most relevant to the present dispute, Former SCC 30.34A.040(1) (2010) established the requisite building height and setbacks in the UC zone:

> The maximum building height . . . shall be 90 feet. A building height increase up to an additional 90 feet may be approved under SCC 30.34A.180 when the additional height is documented to be necessary or desirable when the project is located near a high capacity transit route or station and the applicant prepares an environmental impact statement pursuant to chapter 30.61 SCC that includes an analysis of the environmental impacts of the additional height on, at a minimum:
>
> > (a) aesthetics;
> > (b) light and glare;
> > (c) noise;
> > (d) air quality; and
> > (e) transportation.

SCC 30.34A.085 explained the County's requirements on access to transportation within the UC zone:

> Business or residential buildings . . . either:
>
> (1) Shall be constructed within *one-half mile of existing or planned stops or stations for high capacity transit routes* such as light rail or commuter rail lines or regional express bus routes or transit corridors that contain multiple bus routes;
> (2) Shall provide for *new stops or stations* for such high capacity transit routes or transit corridors within one-half mile of any business or residence

and coordinate with transit providers to assure use of the *new stops or stations*; or

(3) Shall provide a mechanism such as van pools or other similar means of transporting people on a regular schedule in high occupancy vehicles to *operational stops or stations* for high occupancy transit.

Former SCC 30.34A.085, repealed by Amended Ordinance 12-069 (Oct. 17, 2012) (emphasis added). There is no dispute that there are no such existing or planned stops or stations at the site.

Former SCC 30.34A.180 (2010) outlined the County's review process and decision criteria. Former SCC 30.34A.180(2)(c) provided that the urban center development application would be processed as a Type 2 application and the hearing examiner "may approve or approve with conditions" the proposed development when all the following criteria are met:

(i) The development complies with the requirements in this chapter, chapters 30.24 and 30.25 SCC, and requirements of other applicable county code provisions;
(ii) The proposal is *consistent with the comprehensive plan*;
(iii) The proposal will not be materially detrimental to uses or property in the immediate vicinity; and
(iv) The development demonstrates high quality design by incorporating elements such as:
(A) Superior pedestrian- and *transit-oriented architecture*;
(B) Building massing or orientation that responds to site conditions;
(C) Use of structural articulation to reduce bulk and scale impacts of the development;
(D) Use of complementary materials; and
(E) Use of lighting, landscaping, street furniture, public art, and open space to achieve an integrated design;
(v) The development features *high density residential* and/or non-residential uses;
(vi) Buildings and site features are arranged, designed, and oriented to facilitate pedestrian access, to limit conflict between pedestrians and vehicles, and to *provide transit linkages*; and
(vii) Any urban center development abutting a shoreline of the State as defined in RCW 90.58.030(2)(c) and SCC 30.91S.250 shall provide for

12

> public access to the water and shoreline consistent with the goals, policies and regulations of the Snohomish County Shoreline Management Master Program.

(emphasis added).

Along with the authority granted to the hearing examiner in Former SCC 30.34A.180(2)(c) to approve or "approve with conditions" a proposed development, the Code provided the County with the authority to deny a proposal when a proposal presented a "substantial conflict" with the County's "adopted plans, ordinances, [or] regulation or laws."

D. The Superior Court Erred by Not Ruling on the Merits and by Remanding Without Concluding That BSRE Satisfied Any LUPA Standard for Relief

The trial court did not address the merits of the land use petition, nor did it explicitly conclude that BSRE satisfied one of the standards for granting relief under RCW 36.70C.130(1)(a)-(f). In a LUPA petition, the superior court "may grant relief only if the party seeking relief has carried the burden of establishing that one of the standards set forth in (a) through (f) of this subsection has been met." RCW 36.70C.130(1).

BSRE argues that while the Order did not expressly invoke RCW 36.70C.130(1), the finding of bad faith implicitly invoked standards (a) and (f), relating to procedural and constitutional violations respectively. As to the latter, BSRE argues that, by proceeding in bad faith, the County also violated BSRE's right to substantive due process because its actions were arbitrary, irrational, or tainted by improper motive. Br. of Resp't at 22 (citing Robinson v. City of Seattle, 119 Wn.2d 34, 62, 830 P.2d 318 (1992) abrogated by Yim v. City of Seattle, 194 Wn.2d. 682, 451 P.3d 694 (2019)).

13

We find BSRE's argument unpersuasive. Without considering the merits of the administrative record, the trial court could not have concluded that the alleged procedural errors, even if any existed, were indeed "harmless" (as required by RCW 36.70C.130(1)(a)) or that the hearing examiner's actions were indeed "arbitrary, irrational, or tainted by improper motive" (as required by RCW 36.70C.130(1)(f)).

In fact, the trial court made no such findings as to either standard. It is clear from the Order that the trial court considered itself effectively to be merely enforcing a prior order of the first superior court judge. As legitimate as that motive may be, it is simply not a basis for relief provided in LUPA. Cingular Wireless, LLC v. Thurston County, 131 Wn. App. 756, 767-68, 129 P.3d 300 (2006) (relief must be based on one of the six standards under LUPA). Even if the court had tied the alleged lack of good faith to a standard in RCW 36.70C.130(1), our review is de novo and we review the decision of the local jurisdiction without reference to the superior court decision. Rosema, 166 Wn. App. at 297.

Finally, the trial court's decision to return the matter to the County for another lengthy delay is contrary to LUPA's desire for efficient judicial review. See RCW 36.70C.010 ("The purpose of this chapter is to reform the process for judicial review of land use decisions made by local jurisdictions by establishing . . . expedited appeal procedures . . . in order to provide . . . timely judicial review."). "A court must not shy from exercising its jurisdiction. As Chief Justice John Marshall wrote, '[w]e have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.'" Indigenous Env't Network v. Trump, 541 F. Supp. 3d 1152, 1159 (D. Mont. 2021)

14

(alteration in original) (quoting <u>Cohens v. Virginia</u>, 19 U.S. (6 Wheat. ) 264, 404, 5 L. Ed. 257 (1821)).

For these reasons, the superior court erred in not addressing the merits and basing its relief on a standard not contemplated by LUPA. We accept the parties' request to consider and decide this matter on the merits. Specifically, BSRE assigns error to the superior court's failure to find that BSRE complied with the Code only with respect to two "main" specific substantive conflicts: those involving the high capacity transit regulations and those involving the height setback regulations. Our review is limited to the first issue.

E. <u>The Application Failed to Comply with High Capacity Transit Regulations for Buildings Over 90 Feet Because There is No High Capacity Transit Access</u>

The high capacity transit regulation at issue states in relevant part: "The maximum building height in the UC zone shall be 90 feet. A building height increase up to an additional 90 feet may be approved . . . when the additional height is documented to be *necessary or desirable* when the project is located *near a high capacity transit route or station*." Former SCC 30.34A.040(1) (emphasis added).

The following facts are the only facts relevant and are uncontroverted: (1) Seventeen of the 46 buildings BSRE proposed exceeded 90 feet in height. (2) While the Point Wells site is bisected by a BNSF rail line used by Sound Transit commuter rail, there is no existing commuter rail stop, no planned stop, and no commitment by Sound Transit to create one.

BSRE argues that the language of the Code clearly indicates that proximity to a transit route without any actual access is sufficient. BSRE argues the final "or" in Former SCC 30.34A.040(1) (". . . near a high capacity transit route or station . . .") should be

15

interpreted as a "disjunctive conjunction," designating that there are two equally valid alternatives compliant with the rule: the excessively high building must be either near a transit route or near a station, but need not be near both.

The County argues that proximity to a high capacity transit route alone is insufficient for a building height increase as there must be functional access to the route. The County asserts that the legislative intent of Former SCC 30.34A.040(1) is that future residents of extra tall buildings in the Urban Center actually have access to, and the ability to use, the high capacity transit route. The County further asserts that BSRE's interpretation of the Code, requiring only that a high capacity transit route be in the general vicinity, would lead to the absurd result that the urban center development proposal, which is by definition "transit oriented" under the SCC, would provide neither access to nor the ability for residents to actually use the transit route.

Whenever we are tasked with interpreting the meaning and scope of a statute, "our fundamental objective is to determine and give effect to the intent of the legislature." State v. Sweany, 174 Wn.2d 909, 914, 281 P.3d 305 (2012) (citing State v. Budik, 173 Wn.2d 727, 733, 272 P.3d 816 (2012)). We look first to the plain language of the statute as "[t]he surest indication of legislative intent." State v. Ervin, 169 Wn.2d 815, 820, 239 P.3d 354 (2010). "'[I]f the statute's meaning is plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent.'" State v. Hirschfelder, 170 Wn.2d 536, 543, 242 P.3d 876 (2010) (quoting Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002)).

We may determine a statute's plain language by looking to "the text of the statutory provision in question, as well as 'the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole.'" Ervin, 169 Wn.2d at 820 (quoting State v. Jacobs, 154 Wn.2d 596, 600, 115 P.3d 281 (2005)); State v. Larson, 184 Wn.2d 843, 848, 365 P.3d 740 (2015). Again, the primary goal of statutory interpretation is to determine and give effect to the legislature's intent. Jametsky v. Olsen, 179 Wn.2d 756, 762, 317 P.3d 1003 (2014). These principles of statutory interpretation apply to local legislation, such as the SCC. Griffin v. Thurston County, 165 Wn.2d 50, 55, 196 P.3d 141 (2008).

We find BSRE's arguments unpersuasive for the following reasons. First, BSRE's focus on one phrase in the Code (". . . located near a high capacity transit route or station. . .") ignores the repeated statements of legislative intent for residents of a high-density urban centers to have ready access, not just proximity, to mass transit stops and stations. The statute is replete with such references. Former See SCC 30.21.020 (desiring high-density residential developments be located within "one-half mile of existing or planned stops or stations for high capacity transit routes"); Former SCC 30.34A.010 (encouraging higher-density transit developments); Former SCC 30.34A.085(1)-(3) (emphasizing the need for stops and stations); Former SCC 30.34A.180(2)(c)(iv)(a), (v), & (vi) (emphasizing transit-oriented architecture and transit linkages for such high-density developments). Proximity is clearly insufficient; functional access is key. Former SCC 30.21.020 (desiring "access" to transportation such as light rail or commuter rail lines, regional express bus routes).

17

For residents to be able to merely "wave at [a train] as it speeds by," as the County aptly phrases it, would be contrary to that obvious intent. BSRE's reading would lead to this "absurd" result. Strain v. West Travel, Inc., 117 Wn. App. 251, 254, 70 P.3d 158 (2003) ("Statutes must be construed to avoid . . . absurd results.") (citation omitted).

Second, individual words should not be interpreted in isolation and a court should be "reluctant to accept literal readings with . . . 'strained consequences,' especially when they do not align with the statute's purpose and plain meaning of its text." State v. Yusuf, 21 Wn. App. 2d 960, 920-21, 512 P.3d 915 (2022), review denied, 200 Wn.2d 1011, 518 P.3d 206 (2022) (citation omitted). In other words, in interpreting legislative intent, we cannot focus myopically on one sense of one phrase in the Code (". . . located near a high capacity transit route or station . . ."), to the detriment of its context, particularly where other readings exist. Thus, BSRE's reading of the "or" as rigidly disjunctive is not justified.

The "or" can and should be understood, instead, as explanatory or conjunctive, viz., the high rises must be "located near a route and (i.e., as accessible through) its station." Indeed, this court has held that we need not interpret every "or" as disjunctive, where the context so indicates. Black v. Nat'l Merit Ins. Co., 154 Wash. App. 674, 688, 226 P.3d 175 (2010); Bullseye Distrib. LLC v. State Gambling Comm'n, 127 Wn. App. 231, 239, 110 P.3d 1162 (2005) ("the conjunctive 'and' and the disjunctive 'or' may be substituted for each other if it is clear from the plain language of the statute that it is appropriate to do so.").

Third, the parties ignore that the entire provision of the Code is permissive, given the use of the word "may." Former SCC 30.34A.040(1) states that a "building height

18

increase up to an additional 90 feet *may* be approved . . ." if certain conditions are met. (Emphasis added). There is nothing preventing the County from declining to approve a building height increase (or in this case 17 building height increases) even if it were to interpret the provision in the way BSRE desires.

Fourth, and relatedly, BSRE's interpretation ignores the prior additional qualifying phrase that the increase must be "necessary or desirable." Former SCC 30.34A.040(1). On appeal, BSRE argues, without citing any authority, that "desirable" means subjectively desirable to it, the developer. We agree with the County, that the subject to whom the building increase must be desirable is the County. The County's overarching intent is clearly indicated in the GMA. "The GMA discourages sprawl and encourages growth in urban areas served by a multimodal transportation system." Amended Ordinance No. 09-079. Thus, an Urban Zone without a high capacity transit system of any kind would be understandably undesirable to the County.

Fifth and finally, on the interpretation of this provision, LUPA requires that we give substantial or great deference to County's understanding of the Code in this highly technical area. This court should not substitute its judgment for that of county decision-makers. Schofield, 96 Wn. App. at 589.

For these reasons, we interpret Former SCC 30.34A.040(1) in the larger statutory context in which it was adopted and conclude that the County's intent is, not only proximity to high capacity transit, but the ability of its future residents to use and access the high capacity transit.

19

For these reasons, we find that BSRE did not carry its burden in establishing that the County erroneously interpreted or clearly erroneously applied its own Code as to this first substantial conflict. We need reach neither the four remaining alleged substantial conflicts nor whether SCC 30.61.220 violates state law. In short, we deny the Petition on the merits.

### III. CONCLUSION

We reverse and remand this matter to the superior court to dismiss the LUPA petition for the reasons provided above.

Díaz, J.

WE CONCUR:

Coburn, J.                    Smith, A.C.J.